Jason T. Morgan (Bar No. 1602010)
Ryan P. Steen (Bar No. 0912084)
James C. Feldman (Bar No. 1702003)
jason.morgan@stoel.com
ryan.steen@stoel.com
james.feldman@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

*Attorneys for Alaska Oil and Gas Association
and American Petroleum Institute*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>DAVID BERNHARDT,[1] in his official capacity as Secretary of the U.S. Department of the Interior, et al.,<br><br>Defendants. | Case No.: 3:18-cv-00064-SLG |

### [PROPOSED] BRIEF *AMICI CURIAE BY* THE ALASKA OIL AND GAS ASSOCIATION AND THE AMERICAN PETROLEUM INSTITUTE

---

[1] Pursuant to Fed. R. Civ. P. 25(d), David Bernhardt, Secretary for the Department of the Interior, is automatically substituted in as the successor to former Secretary of the Interior Ryan Zinke.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. INTERESTS OF AMICI CURIAE ..................................................................... 4

III. ARGUMENT ....................................................................................................... 4

    A. The ESA Was Not Intended to Apply to Presently Abundant and Healthy Species .......................................................................................... 4

        1. Listing Triggers Immediate Protections for Threatened Species .............. 5

        2. The Pacific Walrus Is Not in Immediate Need of Protection Under the ESA ................................................................................................... 8

    B. The Endangered Species Act Does Not Require Precautionary Listings in the Face of Uncertainty ........................................................................ 13

IV. CONCLUSION ................................................................................................. 18

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG  – i

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Connor v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ...............................................................................14

*Ctr. for Biological Diversity v. Lubchenco,*
    758 F. Supp. 2d 945 (N.D. Cal. 2010) ..................................................................2, 9

*Ctr. for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018) ...............................................................................15

*Defs. of Wildlife v. Norton,*
    258 F.3d 1136 (9th Cir. 2001) .................................................................................9

*Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d 1082 (9th Cir. 2005) ...................10

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.,*
    794 F. Supp. 2d 65 (D.D.C. 2011 ........................................................................2, 14

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978)...........................................................................................2, 5, 6

*Trout Unlimited v. Lohn,*
    645 F. Supp. 2d 929 (D. Or. 2007) ............................................................3, 13, 14, 16

**Statutes**

16 U.S.C. § 1531 ..........................................................................................................1, 11

16 U.S.C. § 1531(a)(2)....................................................................................................5, 8

16 U.S.C. § 1531(c)(1).......................................................................................................11

16 U.S.C. § 1532(6) .......................................................................................................3, 5

16 U.S.C. § 1532(19) ..........................................................................................................6

16 U.S.C. § 1532(20) ...........................................................................................3, 5, 9, 14

16 U.S.C. § 1533................................................................................................... passim

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – ii

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

16 U.S.C. § 1533(b)(1)(A) ....................................................................................6

16 U.S.C. § 1533(d) ..............................................................................................6

16 U.S.C. § 1533(f)(1) ..........................................................................................7

16 U.S.C. § 1536 ..........................................................................................1, 7, 14

16 U.S.C. § 1536(a)(1) ......................................................................................6, 11

16 U.S.C. § 1536(a)(2) ......................................................................................6, 7

16 U.S.C. § 1540 ..................................................................................................6

**Regulations**

50 C.F.R. § 17.31 ..................................................................................................6

**Other Authorities**

119 Cong. Rec. S23458 (daily ed. Dec. 19, 1973) (statement of Sen. Tunney) ...........11

79 Fed. Reg. 10,236 (Feb. 24, 2014) ..................................................................16

79 Fed. Reg. 11,053 (Feb. 27, 2014) ..............................................................10, 16

79 Fed. Reg. 74,954 (Dec. 16, 2014) ..................................................................16

79 Fed. Reg. 77,998 (Dec. 29, 2014) ..................................................................16

79 Fed. Reg. 7136 (Feb. 6, 2014) ......................................................................16

79 Fed. Reg. 8656 (Feb. 13, 2014) ....................................................................16

80 Fed. Reg. 76,068 (Dec. 7, 2015) ....................................................................16

81 Fed. Reg. 22,710 (Apr. 18, 2016) ..................................................................16

82 Fed. Reg. 46,618 (Oct. 5, 2017) ..........................................................9, 13, 15, 17

H. Rep. No. 93-412 (1973), *reprinted in* 1 Cong. Research Serv., A Legislative
    History of the Endangered Species Act of 1973, as amended in 1976, 1977,
    1978, 1979, and 1980, Serial No. 97-6, at 140, 148 (1982) ...........................8

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – iii

Leonid Polyak et al., *History of Sea Ice in the Arctic*, 29 Quaternary Science Reviews 1757–78 at § 4.3 (2010) ................................................................10

Olivia Bensinger, *Endangered Species Act to the Rescue? Climate Change Mitigation and Adaptation Under the ESA*, N.Y.U. Envtl. L. J. (Mar. 29, 2017), https://www.nyuelj.org/2017/03/endangered-species-act-rescue/ ...............12

Shared Strategy Development Committee, Puget Sound Salmon Recovery Plan vol. 1, at 460 (Jan. 19, 2007), http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/puget_sound/chinook/pugetsoundchinookrecoveryplan.pdf ..............................................................................................................8

U.S. Dep't of Commerce et al., Recovery Plan: Elkhorn coral (*Acropora palmata*) and Staghorn coral (*A. cervicornis*), at xiv (Mar. 2015), https://repository.library.noaa.gov/view/noaa/8950 ...................................7

U.S. Fish & Wildlife Serv., Press Release, Salazar Retains Conservation Rule for Polar Bears Underlines Need for Comprehensive Energy and Climate Change Legislation, https://www.fws.gov/news/ShowNews.cfm?ref=salazar-retains-conservation-rule-for-polar-bears-underlines-need-for-compr&_ID=2795 (May 8, 2009)...................................................................................................12

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – iv

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

# I.    INTRODUCTION

The Alaska Oil and Gas Association ("AOGA") and the American Petroleum Institute ("API") (collectively "*amici curiae*") respectfully submit this brief and request that the Court uphold the reasoned decision of the U.S. Fish and Wildlife Service ("FWS") not to list the Pacific walrus as threatened or endangered under the Endangered Species Act ("ESA").  The Pacific walrus is a highly abundant, stable, and adaptable species, currently numbering in the hundreds of thousands of animals.  The species has persisted in the Arctic for over 100,000 years, through periods of heavy sea ice and low (or no) sea ice.  Although the Pacific walrus's sea ice habitat has declined over the past couple of decades, the FWS has found, based upon careful review of the best available scientific information, that "the population is demographically and physiologically resilient to the current levels of sea ice loss."[2]

Notwithstanding these scientific facts, and notwithstanding the Pacific walrus's already-protected status under the Marine Mammal Protection Act, the Center for Biological Diversity ("CBD") argues that the unique protections of the ESA are urgently needed because the Pacific walrus may be "in danger of extinction" *80 years from now* as a result of future global climate changes.[3]  CBD's position necessarily contradicts the considered judgment of the FWS, which determined that the Pacific walrus will not be

---

[2] Administrative Record ("AR") at 466.
[3] *See* Complaint (Dkt. 1); Pl.'s Mot. for Summ. J. (Dkt. 36).

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 1

"in danger of extinction" in the "foreseeable future." CBD invites this Court to look past the rationality of the FWS's determination and wade into scientific debates about how the "best available climate change science" should be interpreted, how Pacific walruses will biologically respond to future habitat changes, and whether the "foreseeable future," for ESA listing purposes, should be 2060 (as the FWS found) or 2100 (as CBD contends).[4] The FWS's response brief points out many of the flaws in CBD's arguments, including the fact that these same arguments have already been (repeatedly) rejected by other courts.[5] Without restating the FWS's arguments, *amici curiae* write separately to emphasize two points.

*First*, the FWS's decision not to list the Pacific walrus is supported by the structure, history, and purpose of the ESA, all of which demonstrate that the Act was intended to address present threats that are having a material impact on a species' survival by requiring on-the-ground conservation responses. The ESA's conservation responses are significant and immediate, and include elevating protection of that species to the "first priority" of every federal agency.[6] In some circumstances, climate change-

---

[4] Dkt. 36 at 1–2.

[5] *See Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 965 (N.D. Cal. 2010) (rejecting CBD argument that listing decision should have been based on climate models out to 2100 rather than 2050); *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 93 n.34 (D.D.C. 2011) (rejecting CBD argument that FWS should have used modeling "beyond 45 years to the year 2100"), *aff'd sub nom. In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.--MDL No. 1993*, 709 F.3d 1 (D.C. Cir. 2013).

[6] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 2

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

associated threats identified by the FWS could provide grounds for a "threatened" listing under the ESA, such as when the best available data show that a species is presently not adapting to changing conditions. But these circumstances are not present here. The record demonstrates that the Pacific walrus population is healthy and resilient to declining sea ice.[7] There is no legal or logical reason to activate the expensive and prescriptive machinery of the ESA.

*Second*, and relatedly, CBD misreads the ESA's cautionary mandate to require the FWS to list the Pacific walrus unless it can *prove* that the species *will adapt* to climate change in the distant future. As set forth below, CBD has conveniently, but improperly, flipped the burden that exists at the listing stage under Section 4 of the ESA. A species can only be listed as threatened if the FWS determines that the species is "likely" to become "in danger of extinction" in the foreseeable future.[8] If the best available data relevant to that question are "uncertain or inconclusive," the FWS may not list the species.[9] Indeed, if, as CBD argues, a species could be listed based on the mere "possibility of it becoming endangered in the foreseeable future," then the result would be "all or nearly all species being listed as threatened."[10] This is plainly not what Congress envisioned in enacting the ESA.

---

[7] AR 466.
[8] 16 U.S.C. § 1532(20), (6).
[9] *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 947 (D. Or. 2007).
[10] *Id.*

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 3

In short, CBD's effort to preemptively and prematurely force a listing of the Pacific walrus decades before the ESA's conservation measures are needed (if they are ever needed) has no basis in the ESA or in the scientific record that supports the FWS's determination. The FWS's reasoned decision not to list the species should be affirmed.

## II.     INTERESTS OF *AMICI CURIAE*

AOGA and API are non-profit trade associations representing the oil and gas industry. AOGA's and API's members include the principal industry stakeholders that operate within the range of the Pacific walrus in Alaska waters and in adjacent waters of the U.S. Outer Continental Shelf. AOGA and API have extensively briefed issues related to the listing of ice-dependent species under the ESA, and AOGA's and API's members have firsthand experience with the impacts of these listing decisions on the regulated community in the Arctic. Moreover, proposed *amici curiae* actively participated in the FWS's listing decision process for the Pacific walrus, commenting on the Notice of Petition Finding and Initiation of Status Review that was published in 2009. This pragmatic experience and independent perspective will be useful to understanding the practical consequences of CBD's proposed relief.

## III.    ARGUMENT

### A.     The ESA Was Not Intended to Apply to Presently Abundant and Healthy Species.

The core premise of CBD's arguments is that the FWS must place the Pacific walrus on the list of threatened species *now* to address threats that may materialize in the

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 4

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

future, regardless of the healthy and abundant status of the species. CBD's arguments cannot be squared with the ESA.

### 1. Listing Triggers Immediate Protections for Threatened Species.

The ESA was intended to address immediate threats to imperiled species. Congress enacted the ESA in 1973 in response to a rise in the number and severity of threats to the world's wildlife, with the intent of preserving threatened and endangered species and the habitat upon which they depend.[11] The stated purpose of the ESA is to ensure the conservation of "species of fish, wildlife, and plants [that] have been so depleted in numbers that they are in danger of or threatened with extinction."[12]

The ESA protections begin with a decision to place a species on the list of threatened or endangered species.[13] Congress expressly defined an "endangered species" in the present sense as "any species which *is in danger of extinction* throughout all or a significant portion of its range."[14] To keep imperiled species from reaching the brink of extinction, Congress also added protections for "threatened species." Congress defined a "threatened species" as one that presently "is *likely to* become an endangered species within the *foreseeable* future."[15] Congress required that the decision to place a species on

---

[11] *See Tenn. Valley Auth.*, 437 U.S. at 177.
[12] 16 U.S.C. § 1531(a)(2).
[13] *Id.* § 1533.
[14] *Id.* § 1532(6) (emphasis added).
[15] *Id.* § 1532(20) (emphases added).

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 5

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

the threatened or endangered list must be determined "solely on the basis of the best scientific and commercial data available."[16]

The decision to list a species as threatened or endangered immediately triggers a host of aggressive (and expensive) conservation measures to "halt and reverse the trend toward species extinction, whatever the cost," and to give the protection of such species "priority over the 'primary missions' of federal agencies."[17] Once listed, the ESA prohibits the "take" of endangered species, making it illegal to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any such species, "or attempt to engage in any such conduct."[18] This prohibition is automatically extended to threatened species under current FWS regulations.[19] Violation of the take prohibition can result in civil and criminal penalties and incarceration.[20]

Additionally, the listing decision immediately places a mandate on every federal agency to "utilize their authorities in furtherance of the purposes [of the ESA] by carrying out programs for the conservation of endangered species and threatened species."[21] Section 7(a)(2) of the ESA further requires federal agencies to "insure that any action authorized, funded, or carried out by such agency" will not "jeopardize the continued

---

[16] *Id.* § 1533(b)(1)(A).
[17] *Tenn. Valley Auth.*, 437 U.S. at 184–85.
[18] 16 U.S.C. § 1532(19).
[19] *Id.* § 1533(d); 50 C.F.R. § 17.31.
[20] 16 U.S.C. § 1540.
[21] *Id.* § 1536(a)(1).

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 6

existence" of a threatened or endangered species.[22]  To fulfill that mandate, federal agencies must "consult" with the National Marine Fisheries Service ("NMFS") (for marine species) and the FWS (for terrestrial species).[23]

The listing decision also triggers a duty on the part of NMFS and FWS to designate "critical habitat" for threatened and endangered species.  Such designations give rise to additional Section 7 consultation obligations to ensure that the designated habitat will not be destroyed or adversely modified by federal actions.[24]  These designations can also cause agencies to impose additional and expensive mitigation requirements through federal permitting processes.

Furthermore, the listing decision triggers a duty on the part of the FWS to develop and implement a recovery plan for each listed threatened or endangered species.[25]  These plans come at an enormous cost.  For example, the recovery plan for Elkhorn and Staghorn coral (in U.S. waters alone) is estimated to cost "$254,540,000+," which "represents an extreme underestimate for the actual cost of recovery."[26]  As another

[22] *Id.* § 1536(a)(2).
[23] *Id.*
[24] *Id.*
[25] *Id.* § 1533(f)(1).
[26] U.S. Dep't of Commerce et al., Recovery Plan:  Elkhorn coral (*Acropora palmata*) and Staghorn coral (*A. cervicornis*), at xiv (Mar. 2015), https://repository.library.noaa.gov/view/noaa/8950.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 7

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
*Main (206) 624-0900 Fax (206) 386-7500*

example, the Puget Sound salmon recovery plan was projected to cost $1.1 billion from 2006 to 2015 for the first 10 years.[27]

The underlying intent of all these requirements is to limit the ESA to those species that are truly in need of immediate protection.[28]  The ESA's protections are needed because "*the decline and disappearance* of species and subspecies is a matter of national and international concern, and that it is necessary . . . to reverse this decline."[29]

### 2. The Pacific Walrus Is Not in Immediate Need of Protection Under the ESA.

The aggressive conservation measures of the ESA make little sense when applied to a species like the Pacific walrus that is presently thriving and has not been materially impacted by an identified threat that *may* affect the species decades into the future.[30] Although large-scale commercial hunting reduced the walrus population to an estimated 50,000–100,000 animals in the 1950s, harvesting regulations helped facilitate recovery such that the FWS now estimates that the current Pacific walrus population is

---

[27] Shared Strategy Development Committee, Puget Sound Salmon Recovery Plan vol. 1, at 460 (Jan. 19, 2007), http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/puget_sound/pugetsoundchinookrecoveryplan.pdf.

[28] *See* 16 U.S.C. § 1531(a)(2) (ESA is intended to ensure conservation of "species of fish, wildlife, and plants [that] have been *so depleted in numbers* that they are in danger of or threatened with extinction" (emphasis added)).

[29] H. Rep. No. 93-412 (1973), *reprinted in* 1 Cong. Research Serv., A Legislative History of the Endangered Species Act of 1973, as amended in 1976, 1977, 1978, 1979, and 1980, Serial No. 97-6, at 140, 148 (1982) (emphasis added).

[30] *See* AR at 399 ("Population modeling indicates that the current population growth rate is equivocal suggesting stability within the Pacific walrus population during the current time period.").

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 8

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

approximately 283,213 animals, and may be as high as 478,975 animals.[31]  The stability, health, and overall fitness of the population is confirmed by the consistent observations of Alaska Native subsistence hunters throughout the Arctic, and there are no data showing that the population "has experienced any reductions in fitness in response to changing ice conditions.[32]

Notably, CBD does not dispute FWS's findings regarding the current health of the Pacific walrus population.  Instead, CBD argues "the best available science shows climate change is destroying the sea ice walruses rely on for their essential life functions and will continue to through at least 2100."[33]  However, "[a] downward trend in habitat by itself is not sufficient to establish that a species should be listed under the ESA."[34]  The ESA's plain language requires that a species, not habitat, be threatened before it can be listed.[35]

Moreover, CBD's statements cannot be reconciled with the scientific record.  For example, "[w]alruses have persisted through several climate transitions over the past 100,000 years."[36]  This includes periods of low ice or ice-free conditions over the last

---

[31] AR at 416–17.
[32] 82 Fed. Reg. 46,618, 46,643 (Oct. 5, 2017); AR at 421, 470.
[33] Dkt. 36 at 18.
[34] *Lubchenco*, 758 F. Supp. 2d at 955; *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) ("[I]t simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing.").
[35] *See* 16 U.S.C. § 1532(20).
[36] AR at 423.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 9

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

12,000 years.[37]  Additionally, walruses have unique characteristics that allow the species to adjust to potential stressors associated with environmental changes.[38]  The record demonstrates that walruses are already capable of adapting to changing sea ice dynamics.[39]  CBD's identification of factors that have the *potential* to impact a thriving species decades from now is insufficient grounds to compel the listing of the Pacific walrus now.[40]

Furthermore, listing now provides no conservation benefits to the Pacific walrus, while imposing costs on federal agencies and the regulated community.  Listing now would require the FWS to immediately engage in recovery planning,  even though the Pacific walrus has already rebounded from over-harvesting from the prior century, and the current population appears to be near present carrying capacity for the species.[41]

STOEL RIVES LLP

600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

---

[37] *See* Leonid Polyak et al., *History of Sea Ice in the Arctic*, 29 Quaternary Science Reviews 1757–78 at § 4.3 (2010) ("Multiple proxy records and climate models indicate that early Holocene temperatures were higher than today and that the Arctic contained less ice, consistent with a high intensity of orbitally-controlled spring and summer insolation that peaked about 11 [thousand years ago] and gradually decreased thereafter.").

[38] AR at 422 (highlighting the flexible habitat use patterns, body size and energy stores, typically high rates of survival, and prolonged parental care as some of the intrinsically adaptive characteristics of the Pacific walrus).

[39] *Id.* at 421; *see also infra* Part III.B.

[40] *See Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d 1082, 1095 (9th Cir. 2005) (warning against the haphazard implementation of the ESA based on speculation or surmise); 79 Fed. Reg. 11,053, 11,070 (Feb. 27, 2014) ("[M]ere identification of factors that *could* impact a species negatively is not sufficient to compel a finding that listing is appropriate . . . ." (emphasis added)).

[41] AR at 416, 506 ("Multiple lines of evidence indicate the pacific walrus population is likely experiencing relatively low levels of stress . . . Charapata (2016, p. 79) suggested that the

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 10

Listing now would further require the FWS to devote its limited resources to determining and designating critical habitat, and then engaging in consultations on every application for federal action within the wide range of that habitat. And listing now would require other federal agencies to begin "carrying out programs for the conservation."[42] These conservation measures were never intended to apply to healthy and abundant species like the Pacific walrus.

Moreover, although a portion of the Pacific walrus's habitat (sea ice) is projected to decline in the future, listing the Pacific walrus as threatened at this time will have no benefit for sea ice. There is nothing in the plain language of the ESA or its legislative history showing that Congress intended the ESA to be used as a tool to combat climate change.[43] Rather, the ESA is intended to force specific actions to conserve and recover imperiled species.[44] Congress did not intend for the Executive Branch to use the ESA as a tool to regulate an extremely complicated global issue such as climate change. Indeed, in 2009, then-Secretary of the Interior Ken Salazar observed that "the Endangered

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

population was currently near carrying capacity based on low levels of reproductive hormones in Pacific walrus bones.").

[42] *Id.* § 1536(a)(1).

[43] *See* 16 U.S.C. § 1531 (listing congressional findings and declaration of purposes and policy of the ESA).

[44] *Id.* § 1531(c)(1) ("It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."); 119 Cong. Rec. S23458 (daily ed. Dec. 19, 1973) (statement of Sen. Tunney) ("Passage of [the ESA] means that the Congress has responded positively to the magnitude of the problem and has voiced its concern for the species which we have placed near extinction.").

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 11

Species Act is not the proper mechanism for controlling our nation's carbon emissions. Instead, we need a comprehensive energy and climate strategy that curbs climate change and its impacts – including the loss of sea ice."[45]

In sum, the ESA was intended to address material conservation needs, not to prophylactically protect a healthy and abundant species. The unique and substantial protections of the ESA should be reserved for species with a demonstrated need for protection and should not apply to every healthy species that may be impacted by climate change at some point in the future. CBD's position, if accepted, would set the bar so low that any species that *could* be conceivably affected by climate-induced habitat changes in the future should be listed *now*, thereby rendering the special protections of the ESA less effective or meaningful. Extending the protections of the ESA to the Pacific walrus would impose substantial burdens on FWS and the regulated community while providing no benefits to a species that does not need to be "recovered."[46]

---

[45] U.S. Fish & Wildlife Serv., Press Release, Salazar Retains Conservation Rule for Polar Bears Underlines Need for Comprehensive Energy and Climate Change Legislation, https://www.fws.gov/news/ShowNews.cfm?ref=salazar-retains-conservation-rule-for-polar-bears-underlines-need-for-compr&_ID=2795 (May 8, 2009); *see also* Olivia Bensinger, *Endangered Species Act to the Rescue? Climate Change Mitigation and Adaptation Under the ESA*, N.Y.U. Envtl. L. J. (Mar. 29, 2017), https://www.nyuelj.org/2017/03/endangered-species-act-rescue/ ("FWS is not the appropriate agency through which to regulate GHG emissions.").

[46] While the Pacific Walrus faces no serious threat, its listing would needlessly divert agency funds and capacity from the backlog of species that need, but have not yet received, protection under the ESA.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 12

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**B.    The Endangered Species Act Does Not Require Precautionary Listings in the Face of Uncertainty.**

In evaluating the risks posed to the Pacific walrus by climate change, FWS determined "that beyond 2060 the conclusions concerning the impacts of the effects of climate change on the Pacific walrus population are based on speculation, rather than reliable prediction."[47]  CBD disagrees with this conclusion and generally criticizes the agency's treatment of scientific uncertainty.[48]  CBD contends that FWS "cannot simply rely on uncertainty to conclude that the impacts from sea ice loss after 2060 no longer constitute a foreseeable threat."[49]  CBD's argument lays bare a clear difference of opinion between CBD and the FWS regarding the treatment of scientific uncertainty under the ESA.  On one hand, CBD takes the position that FWS should give the "benefit of the doubt" to the species and affirmatively list when confronted with uncertainty.  On the other hand, FWS chooses to refrain from listing based upon uncertain information.  The law clearly supports the FWS's approach to Section 4 listings.

Under Section 4 of the ESA, "the default position for all species is that they are not protected."[50]  Rather a "species receives the protections of the ESA only when it is added to the list of threatened species after an affirmative determination that it is 'likely

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

---

[47] 82 Fed. Reg. at 46,643.
[48] *See* Dkt. 36 at 20, 33–35.
[49] *Id.* at 23.
[50] *Trout Unlimited*, 645 F. Supp. at 947.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 13

to become endangered within the foreseeable future.'"[51]  *After* a species has been listed,

courts and agencies commonly give the listed species the "benefit of the doubt" (*i.e.*,

when evaluating potential impacts in a Section 7 consultation).[52]  However, courts have

uniformly rejected the notion that the "benefit of the doubt" standard applies to the

threshold listing decision itself.[53]  Instead, if the "data is uncertain or inconclusive," the

agency cannot list a species.[54]  Otherwise, an ESA listing would be required every time

"there is any *possibility* of [a species] becoming endangered in the foreseeable future,"

which "would result in all or nearly all species being listed as threatened."[55]  This

interpretation makes sense because the ESA expressly limits the listing of species as

"threatened" to those that are "likely" to become endangered, not those that face the mere

possibility of endangerment.[56]

    In the present case, the FWS acknowledged that the Pacific walrus would

experience future reductions in the availability of sea ice, but concluded that it was

"unable to reliably predict the magnitude of the effect and the behavioral response of the

---

[51] *Id.*

[52] *Connor v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citation omitted).

[53] *See, e.g., Trout Unlimited*, 645 F. Supp. at 947; *see also In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d at 110 n.53 ("CBD has cited no instance where a court has found that the Service was required to list a threatened species as endangered based on the 'benefit of doubt' standard, nor is the Court aware of any such authority.").

[54] *Trout Unlimited*, 645 F. Supp. 2d at 947.

[55] *Id.*

[56] 16 U.S.C. § 1532(20).

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 14

Pacific walrus to this change."[57]  Therefore, the FWS concluded that it does "not have

reliable information showing that the magnitude of this change could be sufficient to put

the subspecies in danger of extinction now or in the foreseeable future."[58]  In short, FWS

had insufficient information to conclude that the Pacific walrus is "likely" to become

endangered.  CBD may wish for a more precautionary standard, but such a standard

conflicts with both applicable law and FWS's considered judgment.  CBD's effort to

second-guess the agency and import the "benefit of the doubt" standard into Section 4 of

the ESA should be rejected.  FWS is simply required to "explain why uncertainty justifies

its conclusion,"[59] just as it did here.[60]

CBD takes another stab at this argument by contending that "the rapid loss of

essential sea ice habitat and ocean acidification, put[] the walrus in further jeopardy."[61]

But CBD confuses the *existence* of a threat with the *magnitude* of a threat.  As NMFS and

FWS have repeatedly explained:

> [M]ere identification of factors that *could* impact a species
> negatively is not sufficient to compel a finding that listing is
> appropriate; we require evidence that these factors are

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

---

[57] 82 Fed. Reg. at 46,644.

[58] *Id*.

[59] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1072 (9th Cir. 2018).

[60] *See* 82 Fed. Reg. at 46,643–44 ("Given our prediction that the areas where Pacific walruses[] occur will, in combination, provide sufficient sea ice to meet the species' breeding, birthing, and denning needs, we found that Pacific walruses habitat needs will be met during the core breeding and birthing portions of the annual cycle under all RCP scenarios out to 2060. . . . At this time, sufficient resources remain to meet the subspecies' physical and ecological needs now and into the future.").

[61] Dkt. 36 at 15.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 15

> operative threats that act on the species to the point that the
> species meets the definition of endangered or threatened
> under the Act.[62]

This threat assessment necessarily entails an evaluation of the "magnitude" of risks facing particular species as part of the listing decision.[63] If identification of a threat that could possibly impact a species in the future were enough to warrant listing, then the result would be "all or nearly all species being listed as threatened."[64]

The uncertainty about future impacts associated with climate change is particularly pronounced in this case because of the unique adaptive capacity of the Pacific walrus. FWS defines adaptive capacity "as a species' ability to adjust to environmental change, moderate potential damages, and take advantage of opportunities."[65] Although CBD is dismissive of the FWS's adaptability findings, numerous studies since the 2011 publication of the initial 12-month finding demonstrate how "Pacific walruses have

---

[62] 79 Fed. Reg. at 11,070 (emphasis added). Many listing decisions use identical language. *See, e.g.*, 79 Fed. Reg. 8656, 8665 (Feb. 13, 2014); 79 Fed. Reg. 10,236, 10,257 (Feb. 24, 2014); 79 Fed. Reg. 7136, 7150 (Feb. 6, 2014).

[63] *See, e.g.*, 81 Fed. Reg. 22,710, 22,772 (Apr. 18, 2016) (declining to list fisher because threats are "not of sufficient imminence, intensity, or magnitude"); 80 Fed. Reg. 76,068, 76,101, 76,104-05 (Dec. 7, 2015) (recognizing need to "determin[e] the magnitude of threats" acting on a species before listing); 79 Fed. Reg. 77,998, 78,012 (Dec. 29, 2014) ("Ocean acidification and climate change impacts could affect pinto abalone in the future; however, the magnitude, scope, and nature of these effects are highly uncertain at this time."); 79 Fed. Reg. 74,954, 74,978 (Dec. 16, 2014) ("[T]he likelihood and magnitude of threats from climate change . . . must be examined . . . to fully assess extinction risk.").

[64] *Trout Unlimited*, 645 F. Supp. 2d at 947.

[65] AR at 420.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 16

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

recently altered their behavior in response to changing sea ice dynamics."[66]  For example, scientists have observed adaptive behavior including earlier spring migration and females and young shifting their summer distribution northward, females and young utilizing coastal haulouts in the Chukchi Sea, and the successful use of coastal haulouts by female and juvenile Atlantic walruses in Norway.[67]  FWS further explains that "Pacific walruses have several intrinsic life history characteristics that allow them to persist in a highly seasonal and stochastic environment which may provide capacity to adjust to, or moderate potential stressors associated with future environmental changes."[68]  The unique ability of the Pacific walrus to adapt supports FWS's conclusion that "[w]hile it is likely that the increased use of land habitat will have some negative effects on the population, the magnitude of effect is uncertain given the demonstrated ability of Pacific walruses to change their behavior or adapt to greater use of land."[69]

In short, although the evidence presently before the agency shows uncertainty about how the Pacific walrus will continue to adapt over the coming decades, the FWS appropriately determined, based on its evaluation of the science, that it is presently not "likely" the Pacific walrus will be in danger of extinction in the foreseeable future.  This

---

[66] *See* Dkt. 36 at 26–29; AR at 421.
[67] AR at 421 (citing Jay et al. 2012; MacCracken 2012; Ray et al. 2016; Garlich-Miller et al. 2011; and Kovacs et al. 2014).
[68] *Id.* at 422.
[69] 82 Fed. Reg. at 46,643.

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 17

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

determination is consistent with the purpose and intent of Section 4, and is entitled to deference.

## IV.    CONCLUSION

The Pacific walrus is not in danger of extinction nor is it likely to become so in the foreseeable future.  The ESA's significant protections should be applied to those species with a demonstrated need to be on the list—not to every healthy species that could potentially be impacted by a perceived threat in the distant future.  For the forgoing reasons, proposed *amici curiae* respectfully request that the Court grant Federal Defendants' motion for summary judgment and uphold FWS's non-listing decision.


Respectfully submitted,

DATED:  April 23, 2019.


STOEL RIVES LLP


By: *s/Jason T. Morgan*

Jason T. Morgan (AK Bar No. 1602010)
Ryan P. Steen (AK Bar No. 0912084)
James C. Feldman (AK Bar No. 1702003)
*Attorneys for Proposed Amici Curiae*
*Alaska Oil and Gas Association and*
*American Petroleum Institute*


*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 18

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2019, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. All the participants in this Case No. 3:18-cv-00064-SLG are registered CM/ECF users will be served by the CM/ECF system.

Emily S. Jeffers                        ejeffers@biologicaldiversity.org

Kristen Angela Monsell            kmonsell@biologicaldiversity.org

Kassia Rhoades Siegel             ksiegel@biologicaldiversity.org

Kaitlyn Ashley Poirier              kaitlyn.poirier@usdoj.gov


*s/ Jason T. Morgan*
Jason T. Morgan

101125208.4 0010627-00045

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Center for Biological Diversity v. David Bernhardt, et al.*
Case No. 3:18-cv-00064-SLG – 19