Kassia Siegel (AK Bar No. 0106044)
Kristen Monsell (admitted *pro hac vice*)
Emily Jeffers (admitted *pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7100
Facsimile: (510) 844-7150
Email: ksiegel@biologicaldiversity.org
       kmonsell@biologicaldiversity.org
       ejeffers@biologicaldiversity.org

*Attorneys for Plaintiff*
*Center for Biological Diversity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 3:18-cv-00064-SLG |
| Plaintiff, | |
| v. | |
| DAVID BERNHARDT, et al., | |
| Defendants. | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ........................................................................................... 1

I. The Service Failed to Explain its Change in Position from its Prior Finding that the Pacific Walrus Warranted Protection Under the ESA ........................................... 1

   A. The Service Must Explain its Reversal ......................................................... 2

   B. The Service Failed to Display Awareness that it Was Changing Position or Address Factual Determinations Underpinning the 2011 Finding ............... 5

   C. The Service Did Not Address its Prior Foreseeable Future Determination .. 7

II. The Service Failed to Provide a Rational Connection Between the Facts and its Conclusion that the Walrus Does Not Warrant ESA Protection ............................. 8

   A. The Court Owes No Deference to the Service's Irrational Determinations . 9

   B. The Service Irrationally Dismissed Threats from Sea Ice Loss by Claiming the Walrus Might Adapt to Unprecedented Changes to its Habitat ............. 9

      i. The Service's Adaptation Arguments Are Improper Post-Hoc Justifications ................................................................................. 11

      ii. The Service Distorts the Concept of Adaptation and Ignores ESA Mandates ....................................................................................... 11

      iii. The Record Does Not Support the Service's Adaptation Theory .... 13

   C. The Service Wrongly Dismissed Threats of Trampling and Coastal Erosion ................................................................................................ 15

   D. The Service's Population and Subsistence Harvest Findings Are Irrational ............................................................................................... 17

   E. The Service's Treatment of Scientific Uncertainty Was Improper ............ 19

CONCLUSION ............................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671 (9th Cir. 2016)....................................... 8

*Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241 (D.C. Cir. 2001) ......................................... 12

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962)......................................... 11

*Brower v. Evans*, 257 F.3d 1058 (9th Cir. 2001) ............................................................ 12

*Ctr. for Biol. Div. v. Bureau of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012) .................... 4

*Ctr. for Biol. Div. v. Fish & Wildlife Serv.*, 342 F. Supp. 3d 968 (N.D. Cal. 2018) ......... 18

*Ctr. for Biol. Div. v. Norton*, 254 F.3d 833 (9th Cir. 2001) ................................................ 4

*Ctr. for Biol. Div. v. Zinke*, 900 F.3d 1053 (9th Cir. 2018)........................................... 2,3

*Def. of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ...................................... 12,19

*Def. of Wildlife v. Jewell*, 176 F. Supp. 3d 975 (D. Mont. 2016)...................................... 20

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................................... 2,5,7,8

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, No. 3:18-cv-00029-SLG,
    2019 U.S. Dist. LEXIS 53715 (D. Alaska Mar. 29, 2019) ............................. 2,4,5,7

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) .................. 13

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ................................. 11

*Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) ....................... 12

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ........... 4,17

*Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043 (9th Cir. 2008) .............. 9

*Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139 (D. Or. 1998) ....................... 16,19

*Organized Village of Kake v. Dep't of Agric.* 795 F.3d 956 (9th Cir. 2015) ............... 4,5,6

*Presley v. Etowah County Comm'n*, 502 U.S. 491 (1992) ................................................. 9

*Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219 (9th Cir. 2015) .............................. 4

*Sw. Ctr. for Biol. Div. v. Babbitt*, 215 F.3d 58 (D.C. Cir. 2000) ...................................... 13

**Statutes**

16 U.S.C. § 1402 ........................................................................................................... 10

16 U.S.C. § 1532(20) ................................................................................................. 12,14

16 U.S.C. § 1533(a)(1) ................................................................................................. 12

16 U.S.C. § 1533(a)(1)(A) ............................................................................................ 17

16 U.S.C. § 1533(a)(1)(D) ............................................................................................ 16

16 U.S.C. § 1533(b)(1)(A) .............................................................................................. 7

16 U.S.C. § 1533(b)(3)(C)(ii) .......................................................................................... 4

**Federal Register Notices**

76 Fed. Reg. 7634 (Feb. 10, 2011) ......................................................... 1,6,8,10,13,15,18

82 Fed. Reg. 46618 (Oct. 5, 2017) ...................................................... 2,3,6,7,8,10,17,18,20

iii

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 4 of 26

# INTRODUCTION

The U.S. Fish and Wildlife Service ("Service")'s decision to deny the Pacific walrus protection under the Endangered Species Act ("ESA") is arbitrary and unlawful for two main reasons. First, it does not squarely acknowledge or address the Service's previous determination that listing the walrus was warranted or its contrary factual findings, violating the requirements for a policy change under the Administrative Procedure Act ("APA"). Second, the Service failed to provide a rational connection between the facts and its new conclusion that the walrus does not warrant ESA protection. The Service's suggestion that the walrus has shown itself, in the span of six years, as capable of adapting to the unprecedented loss of its sea ice habitat demonstrates a gross distortion of the best available data and ignores the clear commands of the ESA.

## I. The Service Failed to Explain its Change in Position from its Prior Finding that the Pacific Walrus Warranted Protection Under the ESA

Despite the Service's protestations to the contrary, it must follow basic tenets of administrative law when making listing determinations under the ESA. In this case, the Service was required to explain why it changed its position and disregarded science underpinning its previous finding that the Pacific walrus warranted listing; the failure to do so renders its 2017 determination invalid.

In 2011, the Service found that climate change would destroy Pacific walrus sea ice habitat within the foreseeable future, defined as 2100, and the species warranted protection under the ESA, but was precluded by other listing priorities. 76 Fed. Reg. 7634 (Feb. 10, 2011) ("2011 Finding"). Six years later, under a new administration, the Service

reversed course and found that the Pacific walrus did not warrant listing. 82 Fed. Reg. 46618 (Oct. 5, 2017) ("2017 Finding"). While the scientific consensus on sea ice loss has only grown more dire in the intervening six years, the Service determined that the walrus was not in danger of extinction in the foreseeable future, which the Service re-defined as 2060. In making this determination, the Service failed to explicitly acknowledge that its 2017 Finding constituted a change in policy, nor did it rationally explain its new foreseeable future definition or why the factual determinations supporting its 2011 Finding no longer applied.

The Service's argument that its decision is somehow exempt from longstanding precedent requiring agencies to provide an explanation for a change in position is incorrect. The Ninth Circuit has made clear that a reversal of a "warranted but precluded" finding requires a rational explanation by the Service for its about-face. *Ctr. for Biol. Div. v. Zinke*, 900 F.3d 1053, 1070 (9th Cir. 2018). Likewise, the Service's suggestion that the 2017 Finding contains the requisite explanation ignores the requirements set by the Supreme Court in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), and its progeny. This Court recently reaffirmed these principles in *Friends of Alaska National Wildlife Refuges v. Bernhardt*, where, like here, a federal agency under a new administration failed to acknowledge it was reversing course and "discarded prior factual findings" without a reasonable explanation. No. 3:18-cv-00029-SLG, 2019 U.S. Dist. LEXIS 53715, at *23 (D. Alaska Mar. 29, 2019). The Service's flip-flop is unlawful.

A. <u>The Service Must Explain its Reversal</u>

In *Center for Biological Diversity v. Zinke*, the Ninth Circuit faced a similar set of

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 6 of 26

facts, ultimately concluding that a reversal of a "warranted but precluded" listing decision required the Service to provide a reasoned explanation for disregarding facts that underlay its previous finding. 900 F.3d at 1070. Specifically, in 2010, the Service found that due to habitat loss and climate change, among other factors, listing the arctic grayling was warranted but precluded by other priorities. *Id.* at 1061. The Service later settled various lawsuits over the backlog of ESA listing decisions, which required the Service to issue a proposed listing or not-warranted finding for the grayling in 2014. *Id.* at 1061-62.[1]

In the 2014 Finding, the Service determined that listing the arctic grayling was unwarranted, relying on a study that the species could migrate to cold water, thereby minimizing the threat it faced from low stream levels and high water temperatures in its regular habitat. *Id.* at 1070. The court found the Service's reliance on the arctic grayling's ability to migrate to cold water improper because the migration study was known at the time of the 2010 Finding, yet considered insufficient to make up for the dangers posed by high temperatures. *Id.* As such, "the 2014 Finding was required to provide a reasoned explanation for [the Service's] change in position." *Id.* at 1070. Drawing from a long line of cases, the Ninth Circuit held that not explaining the change in position rendered the Service's decision arbitrary and capricious. *Zinke*, 900 F.3d at 1067-68, 1070.

The Service claims that it does not have to explain its change in position because the 2011 Finding was not a final listing decision, but rather "a step in an evolving deliberative process," and that it must only provide an explanation when it "changes its

---

[1] The Pacific walrus was also a part of that settlement, with the Service stipulating to issue a proposed listing or a not-warranted finding in 2017. 82 Fed. Reg. at 46642.

official policy or departs from a final regulation." Doc. 40 at 11. This is wrong.

The ESA specifically provides that the Service's "warranted but precluded" findings are subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii); *Ctr. for Biol. Div. v. Norton*, 254 F.3d 833, 835 (9th Cir. 2001). Because the APA governs judicial review of agency decisions under the ESA, *Ctr. for Biol. Div. v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012), a reversal of such a determination must comport with the APA, including providing "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, (1983).

The only case the Service cites for its claim that APA review does not apply, Doc. 40 at 11, is inapposite. In *Sierra Club v. Bureau of Land Management*, an agency had internal discussions whether ESA consultation was required for a project, and ultimately decided consultation was unnecessary. 786 F.3d 1219, 1226 (9th Cir. 2015). The court held the agency "did not act arbitrarily or capriciously when it changed its unofficial position regarding consultation" because the "evolving analysis" was not a change in an official position. *Id.* Here, in contrast, the Service's reversal *was* a change in an official position, with both the 2011 and 2017 Findings published in the Federal Register.

The Service's reversal of its prior listing determination is undoubtedly subject to the strictures laid out in *State Farm*, *Fox Television*, and others regarding what is required under the APA when an agency reverses course. *See Friends of Alaska*, 2019 U.S. Dist. LEXIS 53715, at *15-26 (summarizing this line of cases). As the Ninth Circuit explained in *Organized Village of Kake v. Department of Agriculture*, a policy change must

(1) display[] 'awareness that it is changing position,' (2) show[] that 'the new

4

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 8 of 26

policy is permissible under the statute,' (3) [show] 'belie[f]' the new policy is better, and (4) provide[] 'good reasons' for the new policy, which if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include a 'reasoned explanation. . .for disregarding [those] facts. . . .'

795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Fox Tel.*, 556 U.S. at 515-16). The failure to comply with any one of these factors renders an agency's decision invalid.

The Service here fails on at least two counts; it does not explicitly acknowledge that it is changing position, nor does it provide a reasoned explanation for disregarding the facts regarding climate change and loss of habitat that underpinned its 2011 Finding. Further, as detailed below in Section II, the Service's 2017 Finding is wholly illogical.

B. The Service Failed to Display Awareness that it Was Changing Position or Address Factual Determinations Underpinning the 2011 Finding

The Service claims that a cursory, one-sentence mention of the 2011 Finding in the Procedural Background of the 2017 Finding "displayed awareness" that it was changing position. Doc. 40 at 12. But this does not suffice. While the Service may have surpassed what the agency offered in *Friends of Alaska*, where it did not "acknowledge" its prior, contrary determination, 2019 U.S. Dist. LEXIS 53715, at *21, the Service's statement falls well short of the requirements under Supreme Court and Ninth Circuit precedent. For example, in *Fox Television*, the Supreme Court held that the agency complied with the "awareness" requirement where the agency "forthrightly acknowledged that its recent actions ha[d] broken new ground" and "explicitly disavow[ed]" prior agency actions as "no longer good law." 556 U.S. at 517. The Ninth Circuit held in *Kake* that the agency displayed awareness of its changing position because the decision "acknowledge[d] that the Department rejected the Tongass Exemption in

5

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 9 of 26

2001 and recognize[d] that it is now 'treating the Tongass differently.'" 795 F.3d at 967.

In both cases, the agency explicitly acknowledged that its new policy departed from precedent. Here, in contrast, the Service only briefly mentions its prior finding, then ignores it for the rest of the document. It does not state that its conclusion lies contrary to its previous finding, or "acknowledge" that it is breaking new ground. Such an explicit declaration would serve the purpose of the test espoused in *Fox Television* by ensuring the Service properly notices the public of its changing position. *See* 556 U.S. at 515-16.

But even if this Court finds that the Service has displayed the requisite awareness of its changing position, the agency still improperly "discard[ed] prior factual findings without a reasoned explanation." *Kake*, 795 F.3d at 968. For example, as detailed further in Section II.B, the Service found in 2011 that increased use of coastal haulouts would cause localized prey depletion, decreased body condition, calf abandonment, and increased mortality, threatening the species' continued existence within the foreseeable future. 76 Fed. Reg. at 7646-49, 7674. In the 2017 Finding, the Service did not address the facts underpinning those assertions, merely declaring that the species "appears to possess degrees of resiliency, representation, and redundancy that have allowed it to cope with the changing environments of the last decade." 82 Fed. Reg. at 46643. What the Service bases this decision upon is left to the imagination, as the two-page finding in the Federal Register is utterly bereft of any citations to the scientific literature. *Cf.*, 76 Fed. Reg. at 7634-79 (2011 Finding containing 45 pages of analysis with well over 100 scientific references). Instead, it states that "Pacific walruses are intelligent, adaptable, and able to make the necessary adjustments needed to persist," the population is large and

6

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 10 of 26

stable, and since "few malnourished or diseased animals are observed," the current prey base "appears adequate." 82 Fed. Reg. at 46643. The 2017 Finding brushes off the threats of climate change to the species by declaring the "magnitude of effect is uncertain." *Id.*

While the Status Assessment contains a more detailed discussion of the science underlying the 2017 Finding, it cannot provide the rationale for the change in position. The Status Assessment, as a scientific account of the threats facing the population, does not perform the requisite *analysis* of whether the Pacific walrus meets the *legal requirements* for listing under the ESA. 16 U.S.C. § 1533(b)(1)(A) (requiring listing determinations be made "solely on the basis of the best scientific and commercial data available."). The Service's finding itself must accomplish that task, but it wholly fails to do so. Like the agency decision at issue in *Friends of Alaska*, where the later policy contained "[n]ot one sentence" discussing the agency's prior findings, 2019 U.S. Dist. LEXIS 53715, at *23 (citation omitted), the 2017 Finding does not attempt to square its conclusions with the factual findings the agency took pains to support in 2011. *Cf.*, *Fox Tel.*, 556 U.S. at 515 (agency may need to provide more detailed justification when "new policy rests upon factual findings that contradict those which underlay its prior policy").[2]

C.  The Service Did Not Address its Prior Foreseeable Future Determination

The Service also failed to explain its change in position regarding what constitutes the foreseeable future for analyzing threats from climate change to the walrus.

---

[2] Even if the agency could rely on the rationale in the Status Assessment, the document itself fails to provide a sufficient explanation for why the walrus does not warrant ESA protection. *See supra* Section II; Doc. 36 at 13-16, 25-33 (detailing the Service's conclusions in the 2017 Finding that are contrary to the Status Assessment).

7

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*, Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 11 of 26

In its 2011 Finding, the Service defined the foreseeable future as 2100. 76 Fed. Reg. at 7641-44, 7648-49. Then, in its 2017 Finding, the Service defined the foreseeable future as 2060. 82 Fed. Reg. at 46643-44. The 2017 Finding does not acknowledge this change in position. *Cf.*, *Fox Tel.*, 556 U.S. at 515 (holding that an agency must display "awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books").

The Service claims that the impacts of climate change on the walrus are not based on reliable predictions beyond 2060, but does not explain how the state of the science had changed in six years such that a different foreseeable future determination became necessary. The Service's citation to the "M-Opinion"—a memo from the Office of the Solicitor regarding the meaning of "foreseeable future"—in its briefing, Doc. 40 at 15-16, cannot save the agency's failure to explain its change in position, especially since the M-Opinion existed at the time of the Service's 2011 Finding. *See id.* (M-Opinion published in 2009). The law is clear that a change in agency position, including a foreseeable future determination, must be explained. *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681–82 (9th Cir. 2016) (upholding agency's definition of the foreseeable future as 2100 for climate change threats to the bearded seal where agency acknowledged and explained change from prior position that 2050 constituted the foreseeable future). Here, it was not.

## II. The Service Failed to Provide a Rational Connection Between the Facts and its Conclusion that the Walrus Does Not Warrant ESA Protection

Irrespective of the Service's obligation to explain its change in position from its 2011 determination that the walrus warrants protection under the ESA, the Service had to

provide a rational connection between the facts and the agency's 2017 conclusion that the walrus does not warrant protection under the ESA. The agency failed this basic duty.

A. The Court Owes No Deference to the Service's Irrational Determinations

The Service repeatedly argues that the Court should defer to its decision because it involved scientific determinations. *E.g.*, Doc. 40 at 2, 10, 23. But "[d]eference does not mean acquiescence." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508 (1992). Even when "an agency is operating in a field of its expertise," courts must disapprove agency decisions if "the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret." *Nw. Coal. for Alts. to Pesticides v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (citation omitted). Here, the Service's decision is irrational, not supported by the best available science or the ESA, and thus warrants no deference from this Court.

B. The Service Irrationally Dismissed Threats from Sea Ice Loss by Claiming the Walrus Might Adapt to Unprecedented Changes to its Habitat

As explained in the Center's opening brief, and in the Service's 2011 Finding, the best available science demonstrates that the Pacific walrus is an ice-dependent species threatened by the loss of its habitat from climate change. The Service defends both its 2017 definition of the foreseeable future and decision to dismiss the substantial threat of sea ice loss and deny the walrus ESA protection by claiming that the Pacific walrus is an "intelligent" and "adaptable" animal that has recently altered its behavior in response to changing sea ice conditions. Doc. 40 at 1, 18, 19, 25. In other words, according to the Service, the Pacific walrus does not constitute a threatened species because it might adapt to the unprecedented loss of its sea ice habitat by increased use of coastal haulouts. *See*

9

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 13 of 26

*id.*; 82 Fed. Reg. at 46643 ("the magnitude of" the effect of sea ice loss "is uncertain given the demonstrated ability of Pacific walruses to change their behavior or adapt to greater use of land."). This is irrational and contrary to the clear directives of the ESA.

As the Marine Mammal Commission[3] stated in comments recommending the Service list the Pacific walrus, "[a]ssumptions about the ability of walruses to adapt are just that—assumptions." PW0029479. The ESA does not permit the Service to deny a species protection based on the mere assumption that the species might adapt. That is particularly true here, where the scientific evidence demonstrates: (1) the walrus relies on sea ice for its essential life functions, including courtship, giving birth, nursing calves, and resting between foraging trips, 76 Fed. Reg. at 7637; PW0010553-54; (2) the models widely recognized as the best available climate change science demonstrate that this ice will decrease by 96% in the U.S. Chukchi Sea and 82% in the Russian Chukchi Sea in the summer and fall by 2060 and will disappear entirely by 2100, PW0000635; and (3) such losses will make walruses increasingly dependent on coastal haulouts, causing localized prey depletion, decreased body condition, calf abandonment, and increased mortality, leading to a substantial decline in walrus abundance. 76 Fed. Reg. at 7646-49, 7674.

Nevertheless, the Service's counsel argues that the behavior of Pacific walruses in the six years since the agency's 2011 Finding demonstrates that the species may be able to adapt and thus supports both the agency's definition of the foreseeable future and the agency's determination that the impact of sea ice loss is too uncertain to warrant listing.

---

[3] The Marine Mammal Commission is an agency charged with providing independent science-based oversight of federal actions involving marine mammals. 16 U.S.C. § 1402.

10

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 14 of 26

*E.g.*, Doc. 40 at 1, 18-22. This argument misses the mark for several reasons.

### i.  The Service's Adaptation Arguments Are Improper Post-Hoc Justifications

As an initial matter, this "adaptation" explanation does not appear in the agency's decision. It is axiomatic that the Service's finding may be upheld only "on the same basis articulated in the order by the agency itself," not on "post hoc rationalizations" developed by agency counsel. *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962). The agency's counsel cannot salvage the Service's decision by claiming a reasoning that the listing decision itself lacked. *See Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) (agency's "post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself.").

### ii.  The Service Distorts the Concept of Adaptation and Ignores ESA Mandates

Regardless of the post-hoc nature of the Service's "adaptation" argument, the position confuses the behavioral responses of individual animals to changing conditions with adaptation at the population level. It is also contrary to the requirements of the ESA.

As the Service explained in its 2017 Status Assessment, "[c]hange in behavior . . . is often the first response to . . . changing environmental conditions" and that such behavioral changes "can be both adaptative *and maladaptive* to the new conditions." PW0000421 (emphasis added). The Service stated earlier spring migrations and increased use of coastal haulouts represent "recently altered behavior in response to changing sea ice dynamics" and increased use of coastal haulouts in the summer and fall "*may be maladaptive at the population level* due to mortality events and increased energetic costs." PW0000421–22 (emphasis added); *see also* PW0000470 (same).

11

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 15 of 26

Moreover, by the Service's own statements, changes in resiliency, representation, and redundancy—factors that make up the adaptive capacity of a species, PW0000463—of the Pacific walrus over the last decade would be difficult to detect because of the species' long generation time. PW0000470. In other words, the Service cannot dismiss the impact of sea ice loss on the long-term viability of the species based on the last six years. Indeed, by myopically focusing on the behavior of the current population, the Service has arbitrarily written "foreseeable future" out of the listing analysis. *See Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (agency cannot "blue-pencil[] out" statutory term); 16 U.S.C. §§ 1532(20), 1533(a)(1) (listing analysis).[4]

While there may be some scientific uncertainty regarding how precisely the Pacific walrus will respond to the unprecedented loss of its sea ice habitat, scientific findings are often necessarily made from "incomplete or imperfect information." *Brower v. Evans*, 257 F.3d 1058, 1070 (9th Cir. 2001). This is why Congress directed the Service to make listing decisions based on the best *available*, not the best possible, science. *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001). The Service cannot use uncertainty to presume the Pacific walrus might adapt to changes in its habitat, especially in light of record evidence demonstrating habitat loss poses substantial threats to the

---

[4] Similarly, the *amici curiae* brief's suggestion ESA listings focus only on the present status of the species, Doc. 42-1 at 4, 8-12, also ignores this key statutory phrase. "The purpose of creating a separate designation for species which are 'threatened'. . .was to try to 'regulate these animals before the danger becomes imminent while long range action is begun.'" *Def. of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997) (quoting legislative history). A threatened listing provides several benefits not provided by any other law, including the development and implementation of a recovery plan, 16 U.S.C. § 1533(f), which can, for example, help secure measures to reduce carbon emissions.

species in the foreseeable future.[5] Indeed, the Ninth Circuit has already rejected such an approach to ESA listing decisions. *See Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028-30 (9th Cir. 2011) (holding that the Service's conclusion that whitebark pine declines would not threaten the grizzly bear because "the specific response of grizzly bears to declines in whitebark cone production is . . . uncertain" was arbitrary and capricious when "considerable data—demonstrating a relationship between pine seed shortages, increased bear mortality, and decreased female reproductive success"—all pointed to potential impacts to the grizzly bear).

### iii. The Record Does Not Support the Service's Adaptation Theory

Even if the Service could base its decision on the fact the walrus might adapt to sea ice loss (which it cannot), none of the evidence the Service relies on actually supports the Service's "adaptation" theory or foreseeable future definition. The Service points to the fact Pacific walruses are increasingly using coastal haulouts. Doc. 40 at 19, 25. But it was the increased use of coastal haulouts that the Service said in 2011 likely threatened the species with extinction within the foreseeable future. 76 Fed. Reg. at 7646-49. The 2017 Status Assessment also recognized increased use of coastal haulouts as a threat, stating, for example, that "increased used of coastal haulouts . . . through time increases the probability of disturbance related mortality." PW0000400. In other words, the

---

[5] Having "less confidence" in or being "less certain" about impacts after 2060, *see e.g.*, PW0000820, does not equate to a lack of confidence or speculation as the Service's briefing suggests, *e.g.*, Doc. 40 at 15, 16, 17, particularly where the ESA requires reliance on the best *available* science. *Sw. Ctr. for Biol. Div. v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) ("[e]ven if the available scientific and commercial data were quite inconclusive, [the Service] may—indeed must—still rely on it").

13

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 17 of 26

walrus's increased use of coastal haulouts only shows that the species is responding to sea ice loss in precisely the way the agency has said poses a threat to the species.

The Service also points to a 2012 study by Jay, et al. to claim that female Pacific walruses are traveling further to find food, including over 200 kilometers from land-based haulouts. Doc. 40 at 8, 27. But this only undermines the Service's position. It is the need to travel further to find food that the Service has repeatedly identified as a threat to the population. *See, e.g.*, PW0000400 (2017 Status Assessment noting increased use of coastal haulouts over time will "likely result in increased energy expenditure of Pacific walruses to access preferred foraging areas" and "declines in body condition and viral rates over time"); PW0010560 (2011 Status Assessment noting greater energetic costs and potential calf abandonment from travelling greater distances). The Service also claims that "the current prey base of [] walruses appears adequate to meet the energetic and physiological demands of the population." Doc. 40 at 20. This position is unfounded. First, it is not supported by the Status Assessment, which states that "the weight of evidence indicates that Pacific walrus prey has likely been negatively impacted by [ocean acidification]," PW0000434; *see also* PW0000431 (noting data indicate an overall 2-fold decline in macrofaunal benthic mass), and recognizes that numerous scientific studies indicate walrus prey is *not abundant* in the nearshore eastern Chukchi Sea. PW0000407. Second, the relevant question is not just the adequacy of the species' *current* prey base, but the adequacy of that prey base *in the foreseeable future*. *See* 16 U.S.C. § 1532(20). The Service found in 2011 that the walrus's increased use of coastal haulouts will lead to localized prey depletion in the foreseeable future, which will cause reduced body

condition, lower reproductive success and potential death of female walruses, and increased calf mortality from drowning or starvation. 76 Fed. Reg. at 7646; PW0010560. Scientific evidence since the 2011 Finding only reinforces the risk of prey depletion. *See, e.g.*, PW0016119 (noting significant declines in bivalve species in the southern Chukchi Sea); PW0011258 (nearshore areas of Alaska "unlikely" to support large aggregations).

Equally unavailing is the Service's claim that the behavior of Atlantic walruses—*a different species*, PW0000403—somehow demonstrates that Pacific walruses might be able to adapt to increase use of coastal haulouts. *See* Doc. 40 at 19. As the Service recognized in 2011, Atlantic walruses "occupy an area with abundant remote islands that are free or nearly free from disturbance from humans or terrestrial mammals." 76 Fed. Reg. at 7648. "In contrast, when Pacific walruses are restricted to terrestrial haulouts, they face disturbance from a variety of terrestrial predators and . . . higher levels of anthropogenic disturbances, because their haulouts are at the edge of continental land masses and there are very few islands in the Bering and Chukchi Seas." *Id.* And, as stated in the 2017 Status Assessment, Pacific walruses have not responded to the declines in their ice accessible habitat that have occurred already "by occupying more areas in smaller groups as they do on sea ice and as observed for Atlantic walruses at coastal haulouts." PW0000513. As such, "[t]his suggests that other factors are likely restricting their colonization of these areas and may ultimately place bounds on range expansion as a response to climate change and reduced redundancy." *Id.*

    C.  <u>The Service Wrongly Dismissed Threats of Trampling and Coastal Erosion</u>

The Service lacked a rational basis to dismiss the threat of increased trampling or

coastal erosion. The Service defends the 2017 Finding by claiming trampling mortalities have decreased since 2011. Doc. 40 at 8-9, 14, 26. But this disregards record evidence and the commands of the ESA. In support of its position, the agency points to the Status Assessment's statement that "management programs in the U.S. and Russia have been effective at reducing disturbances and haulout related mortalities in recent years." Doc. 40 at 8, 26 (citing PW0000437). But this ignores the very next sentence, which states that "in spite of these efforts it is likely that mortalities among younger animals at coastal haulouts will always occur where large aggregations form on land and the number of mortalities is likely a function of the duration of time spent hauled out," PW0000437, and that "[a]s Pacific walruses become increasingly dependent on coastal haulouts, the potential for disturbances that result in mortality events increase." PW0000494. It also ignores scientific evidence finding that calf and yearling mortality at coastal haulouts is likely to have large negative effects on the population growth rate and "relatively important population consequences." PW0013776, PW0013782.

The Service's justification also fails to explain what "management programs" are in place that purportedly adequately reduce the risk of trampling. This is a substantial omission because the ESA requires the agency to evaluate threats to the species based on "existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). Measures described elsewhere in the Status Assessment such as "guidelines" for airplanes flying near coastal haulouts do not satisfy this standard because, as the Service itself admits, they "are not codified into regulation and [the Service] ha[s] no mechanism to assess compliance." PW0000452; *see also Or. Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1153-56 (D.

16

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 20 of 26

Or. 1998) (voluntary or unenforceable plans are not "regulatory mechanisms").

The Service defends the agency's failure to consider the impacts of coastal erosion by claiming that the Center did not point to evidence that it poses a problem to the walrus. Doc. 40 at 33. This argument is baseless. It is bedrock APA-law that the Service must consider all important aspects of the problem. *State Farm*, 463 U.S. at 43. The Service itself made coastal erosion an important consideration in its 2017 Finding when it based its decision not to list the Pacific walrus on the fact the species might adapt to sea ice loss by using coastal haulouts. *E.g.*, 82 Fed. Reg. at 46643. As such, the availability— or lack thereof—of that coastal habitat within the foreseeable future is certainty an important consideration in the listing analysis. *See* 16 U.S.C. § 1533(a)(1)(A).

The Service's suggestion that coastal erosion and sea-level rise are not a problem because they will "just move the coastline and the location of land-based habitat," Doc. 40 at 34, is illogical, especially considering Arctic topography and record evidence showing threats to walruses from increased use of coastal haulouts. *See, e.g.*, PW0010560 ("Sources of disturbance are expected to be greater at terrestrial haulouts than in offshore pack ice habitats because the level of human activity. . .is much greater along the coast").

D. The Service's Population and Subsistence Harvest Findings Are Irrational

The Service's argument that it did not rely on walrus population trend data in its 2017 decision, Doc. 40 at 28-31, is entirely specious. The Status Assessment is filled with references to the fact the population appears stable or approaching stability. *See, e.g.*, PW0000399, PW0000470, PW0000506. The Service then relied on such determinations in concluding that the walrus demonstrates resiliency and does not warrant listing. 82

17

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 21 of 26

Fed. Reg. at 46643-44. And the Service's own brief references the fact the population "appears to have stabilized" as a reason for its decision. Doc. 40 at 24. But because the available data indicate that it is just as likely the population is still in decline, PW0020857, the Service's reliance on that data to conclude the population does not warrant listing was arbitrary and capricious. *See Ctr. for Biol. Div. v. Fish & Wildlife Serv.*, 342 F. Supp. 3d 968, 978 (N.D. Cal. 2018) (rejecting reliance on inconclusive data to determine population was "basically stable" and does not warrant ESA protection).

The Service's dismissal of the threat of subsistence hunting was also unfounded. In 2011, the Service noted that the levels of harvest at that time were likely within a sustainable range, PW0010578, but found that because there were "no regulatory mechanisms in place to assure the sustainability of subsistence harvest," harvest is likely to threaten the walrus in the foreseeable future as the population declines because of sea ice loss. 76 Fed. Reg. at 7658. The Service cautioned "lack of information on population status and trend make it difficult to quantify sustainable removal levels." PW0010577.

Then, in 2017, the Service reached the opposite conclusion, determining subsistence hunting was not a threat to the walrus, 82 Fed. Reg. at 46643, despite recognizing that "[t]here is a great deal of uncertainty surrounding predictions of Pacific walrus harvest levels into the future," PW0000495, and population trend data is "equivocal." PW0000399, PW0000417. The Service points to non-binding resolutions enacted by the Eskimo Walrus Commission and traditional hunting practiced in Russia that purportedly reduce the risk of disturbance. Doc. 40 at 31-32. But these measures existed at the time of the Service's 2011 Finding and do not constitute new information.

18

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 22 of 26

*See* PW0010577 (2011 Status Assessment referencing these measures). And, regardless, because these measures are not enforceable, the Service cannot rely on them to dismiss the threat of subsistence hunting. *See Or. Nat. Res. Council*, 6 F. Supp. 2d at 1155 (regulatory mechanisms require "some method of enforcing compliance"). The Service also claims that harvest levels decreased between 2008 and 2014, Doc. 40 at 31, but fails to account for the threat of subsistence harvest *in the foreseeable future*. And the Service's assumption that harvest would not be a threat to the walrus is arbitrary considering its repeated references to the uncertainty surrounding the risk of subsistence harvest and that "it was not possible to predict future harvest levels." *E.g.*, PW0000495.

E. The Service's Treatment of Scientific Uncertainty Was Improper

The Service cannot justify its improper treatment of scientific uncertainty. First, the Service inappropriately used scientific uncertainty to deny the walrus ESA protection, violating Congress's directive that the Service "take preventative measures *before* a species is conclusively headed for extinction." *Def. of Wildlife*, 958 F. Supp. at 680. The best available science shows that the key stressors to the walrus—sea ice loss from climate change and the inadequacy of existing regulatory mechanisms to address that threat—have only worsened since the 2011 Finding. *Compare* PW0010553 (2011 Status Assessment noting climate models project ice-free conditions for *up to five months* in the Chukchi Sea by the end of the century) *with* PW0000478-79 (2017 Status Assessment noting an *11-month ice-free period* by 2090). Yet the Service dismissed this threat because of uncertainty about the species' specific response to habitat loss. The Service defends its decision by claiming the walrus has "shown some ability to adapt" to loss of

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 23 of 26

sea ice and the cases involving the arctic grayling and Pacific fisher are distinguishable on this basis. Doc. 40 at 21-22. This is wrong. As explained above, the Ninth Circuit rejected the Service's not warranted finding for the arctic grayling based, in part, on the agency's arbitrary assumption the species could survive warming water by migrating to cold water. *Supra* Sec. I.A. Further, the walrus has not shown an "ability to adapt" to sea ice loss, but is modifying its behavior in response to such loss in precisely the way the Service said in 2011 would threaten its continued existence. *Supra* Sec. II.B. And, in any event, these cases stand for the general notion that "the Service cannot demand a greater level of scientific certainty than has been achieved in the field to date." *Def. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1003 (D. Mont. 2016). But that is just what the Service did.

Second, the Service treated uncertainty differently depending on whether that uncertainty supported the agency's decision that the walrus does not warrant ESA listing. Doc. 36 at 33-35. The Service does not seriously contest this fact, recognizing that an agency cannot rely on some uncertain models while rejecting others "without adequate explanation." Doc. 40 at 34-35 (citation omitted). But nowhere in its decision did the Service actually explain the reasons why it felt it could rely on information it deemed uncertain to conclude that harvest is not a threat to the population and that the population is likely stable and resilient, PW000470, PW0000495, PW0000506; yet dismiss information on the threat of sea ice loss because the magnitude of the threat is allegedly uncertain. 82 Fed. Reg. at 46644. The Service's decision is thus arbitrary and capricious.

## CONCLUSION

The Service's 2017 Finding is unlawful and should be vacated and remanded.

Respectfully submitted this 14th day of May, 2019,

/s/ Kristen Monsell
Kristen Monsell (admitted *pro hac vice*)
Emily Jeffers (admitted *pro hac vice*)
Kassia Siegel (AK Bar No. 0106044)

CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (510) 844-7100
Facsimile: (510) 844-7150
Email: kmonsell@biologicaldiversity.org
        ejeffers@biologicaldiversity.org
        ksiegel@biologicaldiversity.org

*Attorneys for Plaintiff*
*Center for Biological Diversity*

21

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 25 of 26

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2019, a true and correct copy of the foregoing Reply Brief in Support of Plaintiff's Motion for Summary Judgment and Opposition to Defendants' Cross Motion for Summary Judgment was served electronically on all counsel of record using the CM/ECF system.


/s/ Kristen Monsell
Kristen Monsell

22

Pl.'s Reply Br. ISO Mot. For Summ. J., *Ctr. for Biol. Div. v. Bernhardt et al.*,
Case No. 3:18-cv-0064-SLG

Case 3:18-cv-00064-SLG   Document 49   Filed 05/14/19   Page 26 of 26