# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

CENTER FOR
BIOLOGICAL DIVERSITY,

          Plaintiff,

    v.

DAVID BERNHARDT, in his
official capacity as Secretary of
the United States Department of
the Interior, *et al.*,

          Defendants.

Case No. 3:18-cv-00064-SLG

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Before the Court at Docket 35 is Plaintiff Center for Biological Diversity ("CBD")'s Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56. Also before the Court at Docket 39 is Defendants' Motion for Summary Judgment. Amici curiae Alaska Oil and Gas Association and the American Petroleum Institute ("Amici") filed a brief in support of Defendants' position at Docket 51. Oral argument was not requested as to either motion and was not necessary to the Court's determinations.

## STATUTORY AND REGULATORY BACKGROUND

The Endangered Species Act ("ESA") requires the Secretary of the Interior to "determine whether any species is an endangered species or a threatened

species . . . ."[1]  The Secretary may base this determination on any of the following five factors affecting a species: "the present or threatened destruction, modification, or curtailment of its habitat or range;" "overutilization for commercial, recreational, scientific, or educational purposes;" "disease or predation;" "the inadequacy of existing regulatory mechanisms;" or "other natural or manmade factors affecting its continued existence."[2]  The Secretary must rely only on "the best scientific and commercial data available to him after conducting a review of the status of the species . . . ."[3]

"To the maximum extent practicable, within 90 days after receiving" a petition to list a species, "the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" ("90-day finding").[4]  If the Secretary finds that action may be warranted, "the Secretary shall promptly commence a review of the status of the species concerned" and, within 12 months of receiving the petition,

---

[1] 16 U.S.C. § 1533(a)(1). "The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range other than" certain insects.  16 U.S.C. § 1532(6).  "The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

[2] 16 U.S.C. § 1533(a)(1).

[3] 16 U.S.C. § 1533(b)(1)(A).

[4] 16 U.S.C. § 1533(b)(3)(A).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 2 of 40

find that listing is warranted, not warranted, or warranted but precluded by pending listing proposals ("12-month finding").[5]

## FACTUAL BACKGROUND

On February 8, 2008, CBD filed with the Secretary a petition to list the Pacific walrus as threatened or endangered.[6] On December 3, 2008, CBD filed a complaint in the district court, seeking, in relevant part, a declaration that the Secretary was in violation of the ESA for failing to make a 90-day finding and a permanent injunction compelling the Secretary to make and publish a 90-day finding.[7] On May 14, 2009, the parties filed a settlement agreement in that case in which the U.S. Fish and Wildlife Service ("FWS") agreed to publish a 90-day finding as to the Pacific walrus by September 10, 2009.[8] On May 18, 2009, the district court adopted the parties' settlement agreement.[9]

On September 10, 2009, FWS issued its 90-day finding, in which it determined that "the petition presents substantial scientific or commercial

---

[5] 16 U.S.C. § 1533(b)(3)(A)–(B); 50 C.F.R. § 424.14(h)(2)(iii).

[6] PW0000100 (Letter); PW0000001–99 (Petition).

[7] Complaint at 12, *Ctr. for Biological Diversity v. Kempthorne*, 3:08-cv-00265-JWS (D. Alaska Dec. 3, 2008), ECF No. 1.

[8] Stipulated Settlement Agreement at 3, *Ctr. for Biological Diversity v. Kempthorne*, 3:08-cv-00265-JWS (D. Alaska May 14, 2009), ECF No. 11. Although the ESA directs the Secretary of the Interior to make the determination of whether a species is threatened or endangered, the Secretary has delegated this responsibility to FWS. 50 C.F.R. § 402.01(b).

[9] Judgment, *Ctr. for Biological Diversity v. Kempthorne*, 3:08-cv-00265-JWS (D. Alaska May 18,

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 3 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 3 of 40

information indicating that listing this subspecies may be warranted." FWS then initiated "a status review to determine if listing the Pacific walrus [was] warranted."[10] On August 27, 2010, CBD and FWS filed an amended settlement agreement that required FWS to submit its 12-month finding by January 31, 2011.[11] On September 1, 2010, the district court adopted the January 31, 2011 deadline.[12]

On February 10, 2011, FWS issued a 12-month finding as to the Pacific walrus ("2011 Listing Decision").[13] FWS determined that listing the Pacific walrus was warranted but precluded by pending listing proposals.[14] The 45-page decision included subsections summarizing information pertaining to each of the five factors enumerated in 16 U.S.C. § 1533(a)(1), upon which the Secretary may base a determination as to the relevant species.[15] The agency "identif[ied] loss of sea ice

---

2009), ECF No. 12.

[10] PW0000102 (90-Day Finding).

[11] Stipulation to Amend Settlement Agreement at 5, *Ctr. for Biological Diversity v. Kempthorne*, 3:08-cv-00265-JWS (D. Alaska Aug. 27, 2010), ECF No. 13.

[12] Order at 1, *Ctr. for Biological Diversity v. Kempthorne*, 3:08-cv-00265-JWS (D. Alaska Sept. 1, 2010), ECF No. 14.

[13] PW0000106–51 (12-Month Finding on a Petition to List the Pacific Walrus as Endangered or Threatened, 76 Fed. Reg. 7634 (Feb. 10, 2011)); *see also* PW0010524–10686 (Jan. 2011 Status Review of the Pacific Walrus).

[14] PW0000106; 16 U.S.C. § 1533(b)(3)(A)–(B); 50 C.F.R. § 424.14(h)(2)(iii).

[15] PW0000111–146. *See supra* at n. 2 and accompanying text (enumerating factors).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 4 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 4 of 40

in the summer and fall and associated impacts . . . and subsistence harvest . . . as the primary threats to the Pacific walrus in the foreseeable future."[16]   It characterized these threats as being "of sufficient imminence, intensity, and magnitude to cause substantial losses of abundance and an anticipated population decline of Pacific walrus that will continue into the foreseeable future."[17]  FWS also explained the reasoning for its preclusion finding and its efforts to make expeditious progress on listing-candidate species.[18]  In making its findings, FWS determined that the "foreseeable future" extended from 2011 to the year 2100.[19]

On July 12, 2011, in the course of multidistrict litigation related to several listing petitions, CBD and FWS reached a settlement, in which FWS agreed to submit either a proposed rule or a not-warranted finding as to the Pacific walrus by September 30, 2017.[20]  On September 9, 2011, the district court adopted the parties' settlement agreement.[21]

---

[16] *Id.*

[17] PW0000146.

[18] PW0000147–51.

[19] PW0000113–16.

[20] Joint Motion for Approval of Settlement Agreement at 4, *In re: Endangered Species Act Section 4 Deadline Litigation – MDL No. 2165*, 1:10-mc-00377-EGS (D.D.C. July 12, 2011), ECF No. 42.

[21] Order, *In re: Endangered Species Act Section 4 Deadline Litigation – MDL No. 2165*, 1:10-mc-00377-EGS (D.D.C. Sept. 9, 2011), ECF No. 56.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 5 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 5 of 40

In May 2017, FWS issued its Final Species Status Assessment for the Pacific Walrus ("2017 Species Status Assessment" or "Assessment").[22] The 297-page Assessment includes six sections: an introduction, a description of the Pacific walrus, analyses of current and future resource conditions, an analysis of the viability of the Pacific walrus, and management recommendations.[23] The Assessment, relying largely on studies published subsequent to the 2011 Listing Decision, "found that environmental changes over the last several years such as sea ice loss and associated stressors are impacting Pacific walruses, but that other stressors that were identified in 2011 have declined in magnitude."[24] It further determined that "the population is currently under low levels of stress and recovering from a population decline that started about 1980 . . . ."[25] The Assessment also found that the "availability of preferred sea ice habitat for Pacific walruses would decline in the future" and consequently increase stressor levels, indicating likely "future population declines."[26]

However, the 2017 Species Status Assessment also explained that other stressors, such as oil and gas exploration and subsistence harvesting, had

[22] PW0000392–688 (2017 Species Status Assessment).

[23] PW0000395–98.

[24] PW0000399.

[25] *Id.*

[26] PW0000400.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 6 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 6 of 40

declined since 2011. It noted that Pacific walruses had "adapted to living in a dynamic environment and have demonstrated the ability to adjust their distribution and habitat use patterns in response to recent shifting patterns of sea ice," but that "increasing abundance stressors will negatively affect the population but to an unknown extent."[27] Regarding its "foreseeable future" conclusions, the 2017 Assessment noted that FWS "included projections out to 2100 but caution that [FWS] had low confidence in [its] ability to predict how Pacific walruses will respond to stressor levels projected for 2100."[28]

Although the 2017 Final Species Status Assessment acknowledged that FWS's 2011 Listing Decision "concluded that listing the Pacific walrus as threatened or endangered was warranted but precluded," it did not discuss the 2011 process other than to conclude that "[a]s identified in our 2011 assessment, declining sea ice habitat has the greatest potential to negatively affect the Pacific walrus population. Other stressors identified in our 2011 assessment as potentially having a population-level effect have diminished over the last six years."[29]

On October 5, 2017, FWS issued a second 12-month finding as to the Pacific walrus ("2017 Listing Decision").[30] In contrast to the 2011 Listing Decision, the

---

[27] PW0000399–400.

[28] PW0000399.

[29] PW0000399, PW0000514.

[30] PW0000795–822 (12-Month Findings on Petitions to List 25 Species as Endangered or

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 7 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 7 of 40

2017 Listing Decision contained only three pages of analysis related to the Pacific walrus.[31]   However, the 2017 Listing Decision stated that "[a] detailed discussion of the basis for [FWS's] finding can be found in the [2017 Species Status Assessment] and other supporting documents."[32]   Also, in contrast to the 2011 Listing Decision, the 2017 Listing Decision did not include discrete subsections addressing each of the five factors enumerated in 16 U.S.C. § 1533(a)(1).   Instead, the 2017 Listing Decision purported to "summarize . . . the information on which [FWS] based its evaluation of the five factors . . . to determine whether the . . . Pacific walrus . . . [met] the definition of 'endangered species' or 'threatened species.'"[33]   In the 2017 Listing Decision, FWS determined that "the threats affecting the Pacific walrus are not, singly or in combination, of sufficient imminence, intensity, or magnitude that the species is in danger of extinction or is likely to become endangered in the foreseeable future throughout all or a significant portion of its range."[34]   Although FWS concluded that "the Pacific walrus will experience a future reduction in availability of sea ice," the agency was "unable

---

Threatened Species, 82 Fed. Reg. 46,642–44 (Oct. 5, 2017)).   The 2017 Listing Decision also addressed several other species not relevant to this case.

[31] PW0000819–21.

[32] PW0000821.

[33] PW0000796.   The decision also indicated that "[m]ore-detailed information about [the Pacific walrus] is presented in the [Assessment]."   PW0000796.

[34] PW0000821.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 8 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 8 of 40

to reliably predict the magnitude of the effect and the behavioral response of the Pacific walrus to this change," and determined that it lacked "reliable information showing that the magnitude of this change could be sufficient to put the subspecies in danger of extinction now or in the foreseeable future."[35]  FWS further found that "sufficient resources remain to meet the subspecies' physical and ecological needs now and into the future."[36]  Also, in contrast to its determination in 2011 that the foreseeable future extended to the year 2100, FWS determined that the "foreseeable future" extended only to the year 2060.[37]  Based on the foregoing, FWS concluded that "listing the Pacific walrus as an endangered or threatened species under the Act is not warranted at this time."[38]

On March 8, 2018, CBD initiated this action.  The Complaint alleges five claimed violations of the ESA and the Administrative Procedure Act ("APA") in the 2017 Listing Decision: a failure to explain FWS's change in position from the 2011 Listing Decision as to whether listing is appropriate as to the Pacific walrus (Claim I); an improper foreseeable future analysis due to its defining the foreseeable future as 2060 rather than 2100 (Claim II); lack of consideration of the best available scientific data and reaching conclusions contrary to the best available

_____

[35] *Id.*

[36] *Id.*

[37] PW0000820.

[38] PW0000821.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 9 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 9 of 40

scientific data (Claim III); improper and inconsistent treatment of scientific uncertainty (Claim IV); and a failure to consider whether any distinct population segment qualified for listing or whether the Pacific walrus might be threatened or endangered "in a significant portion of its range" (Claim V).[39]

On February 26, 2019, CBD filed its summary judgment motion.[40]  On April 16, 2019, Defendants did the same.[41]

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## LEGAL STANDARD

A court reviews an agency's compliance with the ESA under the Administrative Procedure Act.[42]  A reviewing court may not set aside an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[43]  A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not

---

[39] Docket 1 (Complaint) at 23–27, ¶¶ 97–122.

[40] Docket 35 (CBD's Mot. for Summ. J).  CBD's Memorandum in Support of its Motion for Summary Judgment is at Docket 36.

[41] Docket 39 (Defendants' Mot. for Summ. J.).  Defendants' Memorandum in Support of their Motion for Summary Judgment is at Docket 40.

[42] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012) ("The Administrative Procedure Act ('APA') governs our review of agency decisions under the ESA.").

[43] 5 U.S.C. § 706(2)(A).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 10 of 40

substitute its judgment for that of the administrative agency.[44] "Where the agency is acting on the frontiers of developing science, [a court's] deference is at its highest level."[45]    A court

> will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[46]

## DISCUSSION

CBD asserts that FWS acted "arbitrar[ily], capricious[ly], and in violation of the ESA and basic tenets of administrative law" in several respects.[47]  Although the parties' briefing does not directly track the five claims set forth in CBD's Complaint, the Court addresses each claim in the Complaint in the context of the applicable argument from the briefing.

---

[44] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

[45] *Helping Hand Tools v. U.S. Envtl. Prot. Agency*, 848 F.3d 1185, 1192 n.8 (9th Cir. 2016) (citing *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

[46] *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (internal quotation marks omitted) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

[47] Docket 36 at 8.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 11 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 11 of 40

**Claim I:**     **The adequacy of FWS's explanation for the 2017 Listing Decision's reversal of the 2011 Listing Decision's warranted-but-precluded determination**

In Claim I, CBD asserts that FWS "failed to provide the requisite explanation for its reversal" from the warranted-but-precluded finding in the 2011 Listing Decision to the not-warranted finding in the 2017 Listing Decision.[48] According to CBD, FWS's "abrupt reversal was not accompanied by any acknowledgment from the Service that it was, in fact, changing course, nor by an explanation of how the scientific rationale that underpinned the 2011 warranted determination was no longer valid."[49] Plaintiffs maintain that "[a]part from stating in the procedural history section that the Service made a warranted determination in 2011, the 2017 Finding does not acknowledge the 2011 warranted determination at all."[50]

*a. Applicability of* FCC v. Fox Television Stations, Inc.

In *FCC v. Fox Television Stations, Inc.*, the Supreme Court set out a four-part test to be used when determining whether an agency's policy change complies with the APA.[51] When an agency changes its policy, the

> policy change complies with the APA if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is

---

[48] Docket 36 at 7.

[49] Docket 36 at 18–19.

[50] Docket 36 at 19.

[51] 556 U.S. 502, 515–16 (2009).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 12 of 40

better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[52]

As an initial matter, Defendants assert that "the 2011 finding was not a final listing decision, and it therefore could not have been 'reversed' in 2017."[53]  Instead, they maintain that "the 2011 warranted-but-precluded finding is properly viewed as a step in an evolving deliberative process that culminated in FWS's final decision in 2017 that listing the species was not warranted."[54]  Defendants contend that *FCC v. Fox* is not applicable, because "FWS has not reversed a final policy or regulation"—rather, it "completed the next step in the listing process."[55]

The Ninth Circuit recently addressed the applicability of *FCC v. Fox* in a similar context in *Center for Biological Diversity v. Zinke*, which involved FWS's decades-long consideration of the Arctic grayling's listing status.[56]  In relevant part, FWS determined in 2010 that listing the Arctic grayling was warranted but

---

[52] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (omission in original) (quoting *FCC v. Fox*, 556 U.S. at 515–16).

[53] Docket 40 at 15–16.

[54] Docket 40 at 16.

[55] Docket 40 at 16–17.

[56] 900 F.3d 1053, 1060–62 (9th Cir. 2018).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 13 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 13 of 40

precluded.[57]  In 2014, FWS reached the opposite conclusion, finding that listing the Arctic grayling was not warranted.[58]  The Ninth Circuit applied the *FCC v. Fox* standard to FWS's 2014 listing determination in addressing this policy change.[59]

In light of *Center for Biological Diversity v. Zinke*, the Court finds that *FCC v. Fox* applies in addressing FWS's 2017 Listing Decision for the Pacific walrus.[60] Because certain factual findings underlying FWS's 2017 Listing Decision conflict with factual findings used to support the 2011 Listing Decision, FWS was required to provide a "reasoned explanation" for its change in position.[61]  FWS may support its policy reversal by citing factual circumstances that have changed since its prior

---

[57] *Id.* at 1061.

[58] *Id.* at 1062.

[59] *Id.* at 1067–68 ("When an agency changes a policy based on factual findings that contradict those on which the prior policy was based, an agency must provide a 'reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" (omission in original) (quoting *FCC v. Fox*, 556 U.S. at 515–16)); *see also id.* at 1070 ("Because the 2010 Finding indicated that listing the arctic grayling was warranted irrespective of the Vatland study and recognized the ability of arctic grayling to migrate to tributaries, the 2014 Finding was required to provide a reasoned explanation for FWS's change in position." (citing *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015))).

[60] Although Defendants acknowledge that "the Ninth Circuit . . . applied the test from *Fox Television* . . . to a 12-month finding" in *CBD v. Zinke*, they contend that their statutory arguments were not presented to the Circuit in that case.  Docket 40 at 17 n. 3.  But this Court is bound by the Ninth Circuit's clear application of the *FCC v. Fox* test to an agency's change in position regardless of the underlying arguments that were presented, or not presented, to the Circuit Court.  *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a [circuit] panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court.").

[61] *FCC v. Fox*, 556 U.S. at 515–16.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 14 of 40

action.[62]

b. Whether FWS provided a "reasoned explanation" for its policy change

CBD maintains that FWS's implicit "explanation [for its change in policy] is inadequate and fails to rely upon the best available science."[63] For example, CBD maintains that FWS's conclusion regarding the Pacific walrus's adaptability to coastal haulouts "contradicts the Service's own conclusions in the [2017] Status Assessment, where the Service itself acknowledged that increased use of land will result in increased mortality, energetic stress, and prey depletion."[64] CBD also contends that "the science supporting the walrus listing has only grown stronger since [FWS's] 2011 Finding,"[65] including the accelerating impacts of sea ice loss and ocean warming on the Pacific walrus population and its prey.[66]

CBD maintains in its reply that the 2017 Species Status Assessment "cannot

---

[62] See Ctr. for Biological Diversity v. Zinke, 900 F.3d at 1071–72 (determining that "increase in population" of Arctic grayling subsequent to prior decision supported "sufficient 'reasoned explanation' for FWS's change in position" (citing Organized Vill. of Kake, 795 F.3d at 968)); see also New England Power Generators Ass'n, Inc. v. Fed. Energy Regulatory Comm'n, 879 F.3d 1192, 1201 (D.C. Cir. 2018) ("So long as any change is reasonably explained, it is not arbitrary and capricious for an agency to change its mind in light of experience, or in the face of new or additional evidence, or further analysis or other factors indicating that the agency's earlier decision should be altered or abandoned.").

[63] Docket 36 at 20.

[64] Docket 36 at 20 (citing PW0000435; PW0000470); see also Docket 49 at 12–13 (CBD's Reply).

[65] Docket 36 at 20–21 (citing PW0000231–58).

[66] Docket 36 at 21–22 (citing PW0017911–28; PW0016104–19; PW0011259; PW0019817; PW0013776; PW0019520–29).

Case No. 3:18-cv-00064-SLG, Center for Biological Diversity v. Bernhardt, et al.
Order re Motions for Summary Judgment
Page 15 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 15 of 40

provide the rationale for [FWS's] change in position."[67]  The Court has found no case law indicating that a court's determination of whether an agency has explained its change in position cannot include a document incorporated by reference into a listing decision, such as the 2017 Species Status Assessment. Accordingly, in determining whether FWS adequately explained its 2017 Listing Decision, the Court will consider not only the 2017 Listing Decision but also the 2017 Species Status Assessment.[68]

Both FWS's position in 2011 and its position in 2017 are based on FWS's analysis of the five factors enumerated in 16 U.S.C. § 1533(a)(1).  In the 2011 Listing Decision, FWS concluded that three of the five factors—"the present or threatened destruction, modification, or curtailment of its habitat or range;" "overutilization for commercial, recreational, scientific, or educational purposes;" and "the inadequacy of existing regulatory mechanisms"—supported a warranted-but-precluded finding.[69]  In contrast to the 2011 Listing Decision, the 2017 Listing Decision does not include subsections explicitly addressing each of the factors. However, the 2017 Listing Decision identified the factual considerations FWS took

---

[67] Docket 49 at 11.

[68] The 2017 Listing Decision expressly incorporates the 2017 Species Status Assessment: "A detailed discussion of the basis for this finding can be found in the pacific walrus species-specific assessment form and other supporting documents . . . ."  PW0000821.

[69] PW0000112–46.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 16 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 16 of 40

into account in its analysis which addressed each of the factors.[70]  Moreover, the

2017 Assessment that was incorporated into the 2017 Listing Decision contains

analyses of those same five factors, both current and into the future.[71]  By

comparing FWS's factual findings as to the three statutory factors underlying its

2011 position with the factual findings used to support the 2017 Listing Decision,

the Court can determine whether FWS has provided a "reasoned explanation" for

its change in policy.  The Court addresses each of those factors in turn.

In its 2011 Listing Decision, FWS determined that the first 16 U.S.C.

§ 1533(a)(1) factor—"the present or threatened destruction, modification, or

curtailment of its habitat or range"—constituted "a threat to the Pacific walrus."[72]

The 2011 Listing Decision analyzed the effects of loss of sea ice, ocean warming,

and ocean acidification on the Pacific walrus's habitat or range.[73]  The 2011 Listing

Decision concluded that ocean warming or acidification did not constitute threats

to the Pacific walrus now or in the foreseeable future.[74]  However, it concluded that

---

[70] PW0000819–21.

[71] PW0000424–37 (current habitat conditions); PW0000437–41 (current harvest rates); PW0000441–44 (current disease and predation); PW0000459 (current regulatory mechanisms); PW0000444–000059 (current other natural or manmade factors); PW0000478–95 (future habitat conditions); PW0000495 (future harvest rates); PW0000495–97 (future disease and predation); PW0000497–501 (future other natural or manmade factors).

[72] PW0000121.

[73] PW0000112–26.

[74] PW0000125.  ("[W]e conclude that ocean warming and ocean acidification are not threats to the Pacific walrus now or in the foreseeable future, although we acknowledge that the general

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 17 of 40

"the loss of sea-ice habitat creates several stressors on the Pacific walrus population," including "localized prey depletion; increased energetic costs to reach prey, resulting in decreased body condition; calf abandonment; increased mortality from stampedes, especially to females, juveniles, and calves; and increased exposure to predation and hunting."[75] Accordingly, the 2011 Listing Decision found that "[i]ncreased direct and indirect mortality, particularly of calves, juveniles, and females, will result in a declining population over time."[76]

The 2017 Assessment and the 2017 Listing Decision also address the effects of the loss of sea-ice habitat and corresponding increases in the use of coastal haulouts by the Pacific walrus. In the Assessment, FWS found that "the probability of direct mortality or injury due to trampling during stampedes is greater at coastal haulouts than it is on pack ice."[77] It also noted that hunting and predation at haulouts could increase Pacific walrus mortality.[78] The 2017 Assessment found that if "[l]arge, sustained calf mortality events" occurred "in combination with a large harvest of adult females," the Pacific walrus would likely suffer "significant

---

indications are that impacts appear more likely to be negative than positive or neutral.").

[75] PW0000121.

[76] *Id.*

[77] PW0000435.

[78] PW0000435–36.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 18 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 18 of 40

population-level effects."[79] It also found, however, that haulout mortality trends "suggest that management programs in the US and Russia have been effective at reducing disturbances and haulout related mortalities in recent years."[80] In reaching this conclusion, the 2017 Assessment relied on recent studies and data, including minimum estimates of Chukchi sea haulout mortalities from 2007 to 2016.[81] It also cited a non-binding resolution adopted by the Eskimo Walrus Commission in 2008 that advised hunters to exercise "extreme caution" when hunting at haulouts.[82] Additionally, the 2017 Assessment found that "it is difficult to determine whether or not overall predation rates of Pacific walruses by polar bears have increased" and that "population-level effects remain uncertain."[83] With respect to the effect of projected future losses of sea-ice habitat, the 2017 Assessment found "that as the ice free season increases in the future, Pacific walruses will spend more time at coastal haulouts resulting in increasingly negative effects on the population manifested through increased energy expenditure and disturbance related mortality events."[84] It also found, however, that the magnitude

---

[79] PW0000437.

[80] *Id.*

[81] PW0000436–37.

[82] PW0000435–36.

[83] PW0000444.

[84] PW0000495.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 19 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 19 of 40

of the predicted effect on energy expenditure remains unknown.[85]  Additionally,

the 2017 Assessment concluded that "Pacific walruses habitat needs will be met

during the core breeding and birthing portions of the annual cycle" through 2060.[86]

These conclusions were based on recent studies and data, including models

incorporating data collected after 2011.[87]

Based on the foregoing, the Court finds that FWS has provided a reasoned

explanation for its change of position as to the "present or threatened destruction,

modification, or curtailment of its habitat or range" factor.  Even though FWS did

not expressly acknowledge or articulate that it was changing its position, the 2017

Assessment contains a detailed analysis of the same considerations that FWS

relied upon in its 2011 analysis.  Furthermore, much of FWS's 2017 analysis relies

on data and studies that were developed after the 2011 Listing Decision was

issued; this new information reflected that some relevant factual circumstances

had changed since FWS's 2011 Listing Decision.[88]

In its 2011 Listing Decision, FWS also determined that the second 16 U.S.C.

---

[85] PW0000494.

[86] *See* PW0000487–88.

[87] *See* PW0000486, 494.

[88] *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1071–72 (9th Cir. 2018) (holding that reliance on recent population data and new scientific opinions about local water temperature "provide[d] a sufficient 'reasoned explanation' for FWS's change in position" regarding available Arctic Grayling habitat in the Centennial Valley).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 20 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 20 of 40

§ 1533(a)(1) factor—"overutilization for commercial, recreational, scientific, or educational purposes"—was "likely to threaten the Pacific walrus in the foreseeable future."[89]   FWS analyzed the effects of recreation, scientific, and educational uses of the Pacific walrus; U.S. import and export; commercial harvest; and subsistence harvest.[90]   FWS concluded in 2011 that of these activities, only subsistence harvesting would be likely to threaten the Pacific walrus in the foreseeable future.[91]   FWS predicted that future subsistence harvest of Pacific walruses would "continue at similar levels"; that as the Pacific walrus population declines "the proportion of animals harvested will increase relative to the overall population"; and that "this continued level of subsistence harvest will become unsustainable."[92]

The 2017 Assessment also analyzed the impact of subsistence harvesting on the Pacific walrus.  In the Assessment, FWS concluded that "[t]he subsistence harvest of Pacific walruses has been declining since 1990 with the greatest declines in the US harvest since 2013."[93]   FWS also noted that the current

---

[89] PW0000130.

[90] PW0000126–130.

[91] PW0000129–30.

[92] PW0000130.

[93] PW0000469.  For example, in its 2011 Listing Decision, the FWS found that the average harvest from 2000 to 2008 was 5,285 walruses per year.  PW0000127.  In its 2017 Assessment, FWS found that from 2010 to 2014 the annual harvest ranged from 2,723 to 4,927 walruses per

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 21 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 21 of 40

subsistence harvest was at the "[l]owest level[] on record."[94]  It further noted that changing weather patterns and ice conditions may have negatively impacted hunters' ability to harvest Pacific walruses for subsistence purposes.[95]  FWS expressly acknowledged that in 2011 it had "assumed that total harvest levels would remain the same as observed at that time and that with a declining population, harvest rates may become unsustainable in the future," and that in 2017 it had altered its analytical approach in light of the "great deal of uncertainty surrounding predictions of Pacific walrus harvest levels into the future."[96]

In summary, FWS has provided a reasoned explanation for its 2017 assessment of the "overutilization for commercial, recreational, scientific, or educational purposes" factor.  FWS explicitly acknowledged that it had changed its methodology for evaluating the effect of subsistence harvesting, and explained its rationale for doing so.  The 2017 Assessment relied on recent observations and data, including data collected after the 2011 Listing Decision was issued.  Recent developments suggest that at least one of FWS's 2011 predictions—that subsistence harvests of the Pacific walrus would continue at similar levels—was

---

year.  PW0000439–440.

[94] PW0000467; *see also* PW0000514 ("[S]ubsistence harvest levels are at historically low levels and not considered to be a significant abundance stressor at the present time.").

[95] PW0000514.

[96] PW0000495.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 22 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 22 of 40

erroneous.[97]  Accordingly, FWS has adequately explained its change in position as to this factor.

In its 2011 Listing Decision, FWS also determined that the fourth 16 U.S.C. § 1533(a)(1) factor—"the inadequacy of existing regulatory mechanisms"—weighed in favor of a warranted-but-precluded determination.[98]  FWS then found that "[w]hile laws and regulations exist that help to minimize the effect of other stressors on the Pacific walrus, there are no regulatory mechanisms in place that address the primary threats of habitat loss due to sea-ice declines . . . and subsistence harvest."[99]  Accordingly, in 2011 FWS found that "existing regulatory mechanisms do not remove or reduce the threats to the Pacific walrus from the loss of sea-ice habitat and overutilization."[100]

The 2017 Assessment contains a brief analysis of existing regulatory protections for the Pacific walrus.[101]  Like the 2011 Listing Decision, the Assessment noted that both international and domestic laws and regulations "provide conservation benefits and protections to the Pacific walrus population."[102]

---

[97] *See* PW0000467.

[98] PW0000132–37.

[99] PW0000137.

[100] *Id.*

[101] PW0000459.

[102] *Id.* (noting the Marine Mammal Protection Act, 16 U.S.C. §§ 1361–1423h).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 23 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 23 of 40

But the 2017 Assessment did not contradict the 2011 Listing Decision's findings that "there are no existing regulatory mechanisms to effectively address loss of sea-ice habitat," or that "there are currently no tribal, Federal, or State regulations in place to ensure that, as the population of walrus declines in response to changing sea-ice conditions, the subsistence harvest of walrus will occur at a reduced and sustainable level."[103]

Taken as a whole, however, the 2017 Listing Decision and Assessment nevertheless provide a "reasoned explanation" for FWS's implicit conclusion that this factor does not weigh in favor of a conclusion that listing is warranted. From the 2011 Listing Decision, it is clear that FWS's conclusion that existing regulatory mechanisms are inadequate was contingent upon its finding that the first and second statutory factors also constituted threats to the Pacific walrus.[104] And as noted above, FWS has adequately explained its 2017 conclusion that those two factors do not constitute threats to the Pacific walrus.

In summary, the 2017 Listing Decision constitutes a change in policy from the 2011 Listing Decision, and the change rests in part on "upon factual findings

---

[103] PW0000136, 137. The 2017 Assessment does note that "in 2009–2015 haulout management programs in Russia and the U.S. reduced the number of [Pacific walrus] mortalities range wide," but does not explain what these programs were. PW0000436.

[104] *See* PW0000137 ("[W]e conclude that the existing regulatory mechanisms do not *remove or reduce* the threats to the Pacific walrus from the loss of sea-ice habitat and overutilization." (emphasis added)).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 24 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 24 of 40

that contradict those which underlay [FWS's] prior policy."[105]    Accordingly,

pursuant to *FCC v. Fox*, FWS was required to provide "good reasons" for the

policy, including "a reasoned explanation . . . for disregarding facts and

circumstances that underlay or were engendered by the prior policy."[106]  FWS has

met that burden.   The 2017 Assessment and 2017 Listing Decision contain a

detailed analysis of the ESA factors relevant to the 2017 determination, including

many of the same underlying factual considerations that FWS took into account

when issuing the 2011 Listing Decision.   Although FWS certainly could have

provided a more explicit recognition and discussion of the policy change, the Court

is able to discern the basis for the agency's 2017 listing determination.[107]

Accordingly, the Court finds that FWS has provided the requisite "reasoned

explanation" for its change in policy.

> ### c. The remaining FCC v. Fox elements

In addition to a "reasoned explanation" for a policy change, *FCC v. Fox*

requires that an agency "(1) display[] 'awareness that it is changing position,' (2)

show[] that 'the new policy is permissible under the statute,' [and] (3) 'believe[]' the

---

[105] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)).

[106] *Id.* (omission in original) (quoting *FCC v. Fox*, 556 U.S. at 515–16).

[107] *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 25 of 40

new policy is better."[108]   FWS's 2017 Listing Decision acknowledged its 2011

"finding that listing the Pacific walrus as an endangered or threatened species was

warranted."[109]   FWS's 2017 Listing Decision is also permissible under the ESA,

and it is clear that FWS believes its new policy is better.[110]

Based on the foregoing, the Court will grant summary judgment to

Defendants on Claim I, as FWS has adequately explained its change in position

on the listing of the Pacific walrus.

## Claim II:  Defining the "foreseeable future" as 2060, rather than 2100

In Claim II, CBD alleges that FWS "arbitrarily defined the 'foreseeable future'

for determining the walrus's risk of extinction from climate change as 2060," rather

than 2100.[111]   CBD also maintains that FWS's decision represents a change from

its 2011 decision, in which it characterized the "foreseeable future" as the year

2100, but that the agency provided no explanation for that change in position.[112]

Defendants explain that "FWS does not dispute that the best available science on

---

[108] *Id.* (quoting *FCC v. Fox*, 556 U.S. at 515–16).

[109] PW0000819.

[110] PW0000821.  *Organized Village of Kake*, 795 F.3d at 967 (assuming the Department of Agriculture believed its new policy was better "because it decided to adopt it").

[111] Docket 36 at 7–8; *see also* Docket 49 at 11–12.

[112] Docket 49 at 11–12.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 26 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 26 of 40

sea-ice loss allows FWS to foresee the threat out to 2100."[113]  Rather, FWS was uncertain "about the magnitude of effect that climate change will have on the full suite of environmental conditions (*e.g.,* benthic productivity) or how the species will respond to those changes," particularly after 2060.[114]

The Ninth Circuit appears to have adopted the *FCC v. Fox* analysis when considering whether an agency's change in its determination of the timeframe of the "foreseeable future" complies with the APA.  In *Alaska Oil & Gas Association v. Pritzker*, the Circuit considered whether the National Marine Fisheries Service's "use of longer-term climate projections diverge[d] from its previous practice of setting the year 2050 as the outer boundary of its 'foreseeable future' analysis'" when making a listing decision regarding a subspecies of the Pacific bearded seal.[115]  In finding that the Service's foreseeable-future policy change was neither arbitrary nor capricious, the *Pritzker* Court reasoned that the Service "acknowledge[d] that its interpretation represent[ed] a change in agency policy," "provide[d] a thorough and reasoned explanation," and the new policy was "consistent with the ESA's mandate."[116]  The elements addressed by the Ninth

---

[113] Docket 40 at 21.

[114] PW0000820; *see also id.* ("We find that beyond 2060 the conclusions concerning the impacts of the effects of climate change on the Pacific walrus population are based on speculation, rather than reliable prediction.").

[115] *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016).

[116] *Id.* at 682.  The Circuit also noted that it applies "the same standard of review whether an

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 27 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 27 of 40

Circuit in *Pritzker* track the elements set forth in *FCC v. Fox.*[117]  Accordingly, the Court considers whether FWS, in changing its interpretation of the "foreseeable future" from 2100 to 2060 for the Pacific walrus listing decision, met the standards set forth in *FCC v. Fox.*[118]

The Court finds that FWS displayed some awareness that it was changing position as to the cutoff date for the "foreseeable future."  Although neither the 2017 Species Assessment nor 2017 Listing Decision expressly states that FWS had changed its position on this topic, the Listing Decision acknowledges that FWS "included projections out to 2100 in our analysis, [but] considered 2060 as the foreseeable future timeframe for this analysis." [119]

The Court also finds that FWS showed that the policy of using 2060 as the foreseeable future timeframe is permissible under the ESA.  An Interior Department internal guidance document, to which the Ninth Circuit has recently cited, specifies that FWS's "interpretation of the 'foreseeable future' must be supported by reliable data regarding 'threats to the species, *how the species is*

---

agency issues a new policy or changes a previous policy position," referencing the *FCC v. Fox* standard.  *Id.* at 681.

[117] *Compare id.* at 681–82 *with FCC v. Fox*, 556 U.S. at 515–16.

[118] *Alaska Oil & Gas Ass'n*, 840 F.3d at 681–82.

[119] PW0000821; *see also* PW0000476 (2017 Assessment noting that "[t]he Science Team generally felt that forecasts of Pacific walrus's responses to various environmental changes up to 2060 were more reliable tha[n] those beyond that time period.").

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 28 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 28 of 40

*affected by those threats*, and how the relevant threats operate over time.'"[120] Here, the 2017 Listing Decision explained that FWS was uncertain "about the magnitude of effect that climate change will have on the full suite of environmental conditions (*e.g.,* benthic productivity) or how the [Pacific walrus] will respond to those changes" after 2060.[121]  In short, FWS's "foreseeable future" determination is species-specific, and tied to the agency's ability to predict the effect of environmental change on the Pacific walrus.

Nor is FWS's use of the year 2100 as the "foreseeable future" in its 2011 Listing Decision as to the Pacific walrus determinative.  The ESA requires the Secretary to make listing determinations "solely on the basis of the best scientific and commercial data available . . . ."[122]  This standard allows FWS to consider data that has become available subsequent to a previous listing decision as to that species.  As discussed throughout this order, FWS's 2017 Listing Decision relied on post-2011 data from varied sources regarding the Pacific walrus's adaptability

---

[120] *Alaska Oil & Gas Ass'n*, 840 F.3d at 682 (emphasis added) (quoting U.S. Dep't of the Interior, *Memorandum on the Meaning of "Foreseeable Future" in Section 3(20) of the Endangered Species Act*, No. M–37021 (Jan. 16, 2009)).  *But see* Docket 49 at 12 ("The Service's citation to the "M-Opinion"—a memo from the Office of the Solicitor regarding the meaning of "foreseeable future"—in its briefing . . . cannot save the agency's failure to explain its change in position, especially since the M-Opinion existed at the time of the Service's 2011 Finding.").

[121] PW0000820 (emphasis in original).  In its 2017 Assessment, FWS "made projections at a 15-year time step, which is roughly a Pacific walrus generation length . . . ."  PW0000476.

[122] 16 U.S.C. § 1533(b)(1)(A); *see also Alaska Oil & Gas Ass'n*, 840 F.3d at 681 ("[T]he agency may determine the timeframe for its 'foreseeable future' analysis based upon the best data available for a particular species and its habitat.").

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 29 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 29 of 40

and population status.[123]  And the 2017 Listing Decision stated that FWS scientists "generally felt that forecasts of Pacific walrus's responses to various environmental changes up to 2060 were more reliable tha[n] those beyond that time period."[124] In light of FWS's reliance on new data and scientific opinions as to the Pacific walrus, its decision to select the year 2060 as the "foreseeable future" was permissible under the ESA under any deference standard.[125]

The Court also finds that FWS believes that using the year 2060 as the foreseeable future is better than using the year 2100.[126]  FWS recognized in the 2017 Listing Decision that its scientists believed forecasts to 2060 were more reliable than those to 2100.[127]  FWS found that using the year 2060 allowed it to make better predictions, since it had "less confidence in [its] ability to predict the

---

[123] *See supra* at 18–23.

[124] PW0000476.

[125] District courts in this Circuit have applied different levels of deference to an agency's determination of the "foreseeable future."  *See, e.g.*, *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1177 (D. Id. 2013) (applying *Chevron* deference); *Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 963–64 (N.D. Cal. 2010) (determining that *Skidmore*, rather than *Chevron*, is appropriate standard).  However, a court need not determine which standard to apply when the result would be the same under any standard. *State of Hawaii ex rel. Attorney Gen. v. Fed. Emergency Mgmt. Agency*, 294 F.3d 1152, 1158 (9th Cir. 2002) ("Deciding how much deference to grant often presents difficult problems for courts.  In this case, however, we need not make such a determination.  Even under the standard that grants maximum deference to an agency's statutory interpretation[,] . . . FEMA's interpretation of § 5155(c) cannot stand." (internal citations omitted)).

[126] *See Organized Village of Kake v. U.S. Dept. Agriculture*, 795 F.3d 956, 967 (9th Cir. 2015) (assuming the Department of Agriculture believed its new policy was better "because it decided to adopt it").

[127] PW0000476.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 30 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 30 of 40

potential behavioral and physiological adaptations of Pacific walruses, and the resulting consequences for reproduction and survival under the sea ice conditions projected for 2100 because of the extensive time between now and 2100."[128]

Finally, the Court finds that FWS provided good reasons to end the foreseeable future at the year 2060 in its 2017 Listing Decision. The 2017 Listing Decision states that FWS found "that beyond 2060 the conclusions concerning the impacts other effects of climate change on the Pacific walrus population are based on speculation, rather than reliable prediction."[129] The 2017 Species Assessment reviews model projections for future global warming trends, sea ice seasons, Pacific walrus habitat access, ocean warming, benthic productivity, and ocean acidification.[130] Many of the models project out through the years 2060 and 2100.[131] In its discussion of concerns about speculation related to projections about the effects of climate change on the benthos, FWS noted that "variation among Science Team members (uncertainty) also increased with time, particularly

---

[128] *Id.*

[129] PW0000820, 821.

[130] PW0000476–493 (citing studies from 2011, 2012, 2013, 2014, 2015, 2016, and 2017, along with previous studies).

[131] *See, e.g.*, PW0000478 (estimating greenhouse gas concentrations through 2060 and 2100); PW 0000480 (estimating mean number of ice-free months in Bering and Chukchi Seas through 2060 and 2100). *But see* PW0000492 (estimating Bering Sea benthic infauna mass through 2040).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 31 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 31 of 40

in 2100."[132]  And the 2017 Assessment specifically addresses uncertainty, stating that "model uncertainty in [sea surface temperature] projections arising from the internal variability of the climate system and initializing conditions outweighs uncertainties associated with the alternative scenarios to about mid-century, but by late century scenario uncertainly takes over."[133]

FWS adequately explained its decision to use the year 2060 as the timeframe for its foreseeable future analysis.  The Court finds that determination was neither arbitrary nor capricious.  In addition, the Court finds that FWS adequately complied with *Fox v. FCC* in making this policy change, although the agency could have been far more explicit in acknowledging and explaining its decision.[134]  Based on the foregoing, the Court will grant summary judgment to Defendants on Claim II.

**Claim III:     The adequacy of FWS's consideration of the Best Available Scientific Data**

In Claim III, CBD alleges that FWS "reached unfounded conclusions contrary to the available evidence."[135]  CBD asserts that FWS "irrationally

---

[132] PW0000493.

[133] PW0000507 (citing a 2016 study).

[134] *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 43 (1983) ("We will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))).

[135] Docket 36 at 8.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 32 of 40

concluded that the Pacific walrus could adapt to massive losses of habitat."[136] CBD points to evidence "that the walrus will *not* be able to adapt" to sea ice loss, including the lack of observations of breeding from coastal haulouts, and a risk of "increased mortality, decreased prey availability, increased energetic costs, and decreased calf survival."[137]

As discussed elsewhere in this order, recent studies support the conclusion that the Pacific walrus has thus far adapted to its changing circumstances.[138] FWS acted neither arbitrarily nor capriciously in drawing that conclusion.

CBD also relies on the 2011 Species Status Report and peer reviews of the draft 2017 status report to assert that Pacific walruses are dependent on sea ice.[139] But these sources do not undermine FWS's conclusion that Pacific walruses have so far adapted sufficiently to coastal haulouts.[140] CBD's speculation about the possible future impact of stressors on the Pacific walrus population is insufficient to require a different conclusion than that drawn by FWS based on the best

---

[136] Docket 36 at 32, 32–35 (some capitalizations omitted).

[137] Docket 36 at 32 (emphasis in original) (citing PW0000411, PW0000470, PW0029476).

[138] *Supra*, at 18–20.

[139] Docket 36 at 36 (citing PW0010553–54; PW0029736; PW0029846; PW0029520; PW0029504).

[140] FWS acknowledged that "population level consequences of the changes in behavior associated with the use of coastal haulouts needs to be determined." PW0000422.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 33 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 33 of 40

available science.

CBD also maintains that FWS's "arbitrary conclusions regarding Pacific walrus population trends and subsistence harvest levels render its decision unlawful."[141] CBD relies on two cases to support this point. CBD cites *Tucson Herpetological Society v. Salazar* for the proposition that "[i]f the science on population size and trends is underdeveloped and unclear, the [Service] cannot reasonably infer that the absence of evidence of population decline equates to evidence of persistence."[142] And in its reply, CBD cites to *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, which, it asserts, "reject[ed] reliance on inconclusive data to determine population was 'basically stable' and does not warrant ESA protection."[143]

In *Tucson*, the Ninth Circuit held that a FWS listing decision was not supported by the administrative record because the agency had impermissibly relied on a "single attenuated finding" of population viability to draw a "sweeping conclusion that viable lizard populations persist throughout most of the species' current range."[144] In this case, FWS relied on a relatively strong base of

---

[141] Docket 36 at 37, 37–39 (some capitalizations omitted).

[142] Docket 36 at 37 (alterations in original) (quoting 566 F.3d 870, 879 (9th Cir. 2009)).

[143] Docket 49 at 22 (quoting 342 F. Supp. 3d 968, 978 (N.D. Cal. 2018), *amended in part*, No. C 16-06040 WHA, 2018 WL 6067546 (N.D. Cal. Nov. 20, 2018), *appeal dismissed*, No. 19-15102, 2019 WL 1762190 (9th Cir. Apr. 10, 2019)).

[144] *Tucson Herp. Soc'y*, 566 F.3d at 879.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 34 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 34 of 40

information in reaching its 2017 Listing Decision: reduced harvest levels, few observations of malnourished animals, relatively high reproduction and survival rates, an apparently adequate prey base, and positive feedback about the Pacific walrus's status from Alaska Native hunters.[145]  Although uncertainty persists for the Pacific walrus, the administrative record contains a substantial amount of data that support FWS's conclusions.

*Center for Biological Diversity v. U.S. Fish & Wildlife Service* is also inapposite.  There, the district court vacated FWS's withdrawal of the Pacific fisher after concluding that the agency's assessment of the toxicant exposure stressor was contrary to the evidence in the administrative record and the agency had applied "flawed logic regarding population stability."[146]  Pacific fisher populations had been severely diminished,[147] and the court found that FWS had misinterpreted the data and ignored contrary scientific evidence when it concluded that the species' population levels had stabilized.[148]

In this case, FWS considered several sources of data in making its 2017 listing determination as to the Pacific walrus.  More importantly, the Pacific walrus

---

[145] PW0000820; PW0000463–70.

[146] *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d at 976.

[147] *See id.* at 970 ("The Service does not dispute that the Pacific fisher population has declined dramatically and that it remains notably small.").

[148] *Id.* at 976–79.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 35 of 40

appears to be in a much stronger position than the Pacific fisher, even by the most conservative estimates.[149] And FWS recognized the "low precision" of current Pacific walrus population estimates; it does not appear to have relied on the population estimates in reaching its 2017 decision.[150]

CBD also asserts that recent studies on which FWS relied do not support the agency's conclusions. Specifically, some studies show populations decreasing.[151] But an author of those studies concluded that "the population growth rate either increased during 1999–2015 or stabilized at a lesser level of decline than seen in the 1980s."[152] Particularly in light of the deference owed to agencies in making scientific determinations, the Court finds that the administrative record contains sufficient evidence to support FWS's conclusions.[153] Based on

---

[149] PW0000416 (citing studies showing an estimated 2006 Pacific walrus population of 129,000, with 95-percent confidence interval lower endpoint of 55,000, and an estimated 2014 population of 283,213, with a 95-percent confidence interval lower endpoint of 93,000).

[150] PW0000819–20 ("[T]his abundance estimate should be interpreted with extreme caution due to the preliminary nature of the estimate and the low precision estimates in the model.").

[151] Docket 36 at 38 (citing PW0020841, PW0020857, PW0020865).

[152] PW0020841.

[153] PW0000417–24. *See also Helping Hand Tools v. U.S. Envtl. Prot. Agency*, 848 F.3d 1185, 1192 n.8 (9th Cir. 2016) ("Where the agency is acting on the frontiers of developing science, our deference is at its highest level." (citing *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983))).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 36 of 40

the foregoing, the Court will grant summary judgment to Defendants on Claim III.

**Claim IV:    FWS's treatment of uncertainty**

In Claim IV, CBD alleges that FWS "treated scientific uncertainty inconsistently" by "dismissing the negative impacts of sea ice loss beyond 2060 because of uncertainly, while relying on uncertainty to conclude that the walrus would be able to adapt to the loss of its sea ice habitat, that the population is approaching stability, and that subsistence harvest would remain sustainable."[154]

As discussed above, FWS had substantial information to support its conclusion that the current Pacific walrus population has either increased or stabilized.[155]   And FWS's reliance on that information to determine that the population had demonstrated resilience, was likely stable, and that survival rates are increasing, is not irrational.

CBD also maintains that although FWS "repeatedly recognized the uncertainty regarding future harvest levels," it "relied on modeling that assumed harvest levels would be 'low' . . . in concluding that future harvest levels would be sustainable and not threaten the population."[156]   CBD cites to *National Wildlife*

---

[154] Docket 1 at 26, ¶ 115; *see also* Docket 36 at 39–41.

[155] *Supra* at 34–37; PW0020841; PW0000417–24; PW0000463–70; *but see* PW000819–820 (2017 Listing Decision noting that "this abundance estimate should be interpreted with extreme caution due to the preliminary nature of the estimate and the low precision estimates in the model.").

[156] Docket 36 at 40 (citing PW0000119; PW0000400; PW0000495; PW0000589); *see also* Docket 49 at 22–23.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 37 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 37 of 40

*Federation v. National Marine Fisheries Service*, in which the District of Oregon found that the NMFS's treatment of uncertainty was "inconsistent" and selective in support of NMFS's conclusion.[157] But here, while recognizing that predicting future harvest levels was uncertain,[158] FWS relied on the most recent data to draw its conclusion that harvest levels would remain low: "The Science Team agreed that it was not possible to predict future harvest levels and therefore decided to set harvest levels at the current level (low) . . . ."[159] Although FWS could have chosen a higher estimate for future harvest levels, it was neither arbitrary nor capricious to take an optimistic approach based on the existing data, particularly when its 2011 prediction that harvest levels would remain stable was proven incorrect.[160]

CBD also maintains that FWS improperly relied on uncertainty in limiting the foreseeable future to 2060.[161] However, the administrative record supports FWS's determination that "while it is likely that the increased use of land habitat will have some negative effects on the population, the magnitude of effect is uncertain given

---

[157] 184 F. Supp. 3d 861, 928 (D. Or. 2016).

[158] PW0000495.

[159] *Id.*; *see also* PW0000439 (showing recent decline in harvest levels of Pacific walrus); PW0000437–40 (discussing harvest levels and relevant data); PW0010577 (describing recent conservation efforts).

[160] *See* PW0000130 (predicting that subsistence harvest would "continue at similar levels" into the future).

[161] Docket 36 at 7–8.

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 38 of 40

the demonstrated ability of Pacific walruses to change their behavior or adapt to greater use of land."[162]   Based on the foregoing, the Court will grant summary judgment to Defendants on Claim IV.

**Claim V:    The adequacy of FWS's Listing Analysis**

In Claim V, CBD alleges that FWS "did not consider whether the Pacific walrus might be threated or endangered 'in a significant portion of its range.'"[163] CBD takes issue with FWS's abundance model—the pooling of land and ice habitats—and asserts that FWS should have analyzed land habitats and ice habitats separately.[164]   But the record demonstrates that FWS considered projections regarding sea-ice habitat and land habitat both individually and collectively.[165]

CBD also maintains that FWS "failed to consider the destruction of land habitat due to coastal erosion and sea level rise."[166]  CBD has shown that "[c]oastal

---

[162] PW0000820.

[163] Docket 1 at 27, ¶ 120.

[164] Docket 36 at 35–36 (citing PW0029846 (draft of the 2017 Assessment annotated by FWS)).

[165] *See* PW0000479–87.  FWS "defined potential habitat to be marine water, sea ice, or land within the study area that could be access and used by Pacific walruses within a particular season."  PW0000483.  FWS then presented "results both pooled across potential habitat types (ice-accessible and land-accessible) and separated by potential habitat type."  *Id.*  FWS "present[ed] selected pooled results here for simplicity, especially when results varied little between habitat types" but included in an appendix a "more comprehensive presentation of results."  *Id*; *see also* PW0000616–641 (Appendix B to 2017 Assessment).

[166] Docket 36 at 35, 36–37; *see also* Docket 49 at 21.

---

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 39 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 39 of 40

erosion rates in the Arctic are among the highest in the world," but CBD has not shown that this coastal erosion will reduce Pacific walrus habitat.[167]   Absent evidence in the record that coastal erosion is an "important aspect" of the Pacific walrus's listing status, FWS's failure to address the issue was not arbitrary or capricious.[168]

Accordingly, the Court will grant summary judgment to Defendants as to Claim V.

## CONCLUSION

In light of the foregoing, IT IS ORDERED as follows:

CBD's Motion for Summary Judgment at Docket 35 is DENIED and Defendants' Motion for Summary Judgment at Docket 39 is GRANTED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 26th day of September, 2019, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[167] Docket 36 at 37 (citing PW0026257).  FWS argues that "CBD does not identify any evidence that erosion and sea-level rise will do anything more than just move the coastline and the location of land-based habitat." Docket 40 at 39.

[168] *See Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if agency "entirely fail[s] to consider an important aspect of the problem").  As FWS argues, CBD did not address coastal erosion in its comments to the agency ahead of the 2017 Listing Decision.  Docket 40 at 39; *see also* PW0000231–58 (Dec. 21, 2016 Comments); PW0000727–31 (July 28, 2017 Comments).

Case No. 3:18-cv-00064-SLG, *Center for Biological Diversity v. Bernhardt, et al.*
Order re Motions for Summary Judgment
Page 40 of 40

Case 3:18-cv-00064-SLG   Document 54   Filed 09/26/19   Page 40 of 40